Filed 4/26/16

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u><sup>*</sup>


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----


| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | C073027 |
| v. | (Super. Ct. No. SF118835A) |
| DAWSON ANDREW McGEHEE, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of San Joaquin County, William D. Johnson, Judge. Affirmed.

Scott Concklin, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Senior Assistant Attorney General, Julie A. Hokans and John W. Powell, Deputy Attorneys General, for Plaintiff and Respondent.

---

\* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts III through VI of the discussion.

1

Defendant Dawson Andrew McGehee stabbed his mother ten times in the neck, chest, and abdomen with a kitchen knife; eight of the stab wounds were independently fatal. By all accounts, defendant was mentally disturbed when he did so. The central dispute during both the guilt and sanity phases of his murder trial involved the nature and severity of the disturbance—in the guilt phase, whether defendant actually "premeditated, deliberated, or harbored malice aforethought" (Pen. Code, § 28); in the sanity phase, whether defendant was "incapable of knowing or understanding the nature and quality of his . . . act and of distinguishing right from wrong"—when he stabbed his mother to death.[1] (§ 25, subd. (b).)

The jury found defendant guilty of second degree murder, during the commission of which he personally used a deadly weapon, and further found he was legally sane when he committed the crime. The trial court sentenced defendant to state prison for an indeterminate term of 15 years to life for the murder, plus a consecutive determinate term of one year for the use of a deadly weapon, and imposed other orders.

In the published portion of this opinion, we address and reject defendant's claims that (1) the trial court prejudicially erred and violated his federal constitutional right to due process by instructing the jury, during the guilt phase of the trial, with CALCRIM No. 362 on consciousness of guilt along with CALCRIM No. 3428 on the limited use of evidence of mental impairment; and (2) the trial court prejudicially erred by failing to instruct the jury on involuntary manslaughter as a lesser included offense to murder. With respect to the first claim, defendant argues the trial court should have modified CALCRIM No. 3428 to allow the jury to consider evidence of his mental illness or impairment—in addition to determining whether he premeditated, deliberated, or

---

[1] Undesignated statutory references are to the Penal Code. Defendant also disputed his identification as the perpetrator during the guilt phase.

2

harbored malice—in determining whether certain untruthful statements were knowingly made, and therefore evidenced his consciousness of guilt. As we explain, defendant did not object to either CALCRIM No. 362 or CALCRIM No. 3428 as given to the jury in this case. He has therefore forfeited the contention unless the claimed error affected his substantial rights, i.e., resulted in a miscarriage of justice. (See *People v. Anderson* (2007) 152 Cal.App.4th 919, 927.) While we agree the instruction should have been modified, on this record, there was no miscarriage of justice. Nor were defendant's due process rights violated. Accordingly, the claim is forfeited.

With respect to the second claim, we conclude there is no substantial evidence in this record indicating defendant did not actually form the intent to kill when he stabbed his mother ten times with a kitchen knife. While there is substantial evidence indicating he may have believed she was a demon when he did so, whether or not this delusion existed, and if so, whether or not the delusion exonerated defendant for killing—with express malice—the person he believed to be a demon, was properly reserved for the sanity phase of the trial.

In the unpublished portion of the opinion, we reject defendant's remaining contentions. Specifically, we reject his claim the trial court prejudicially erred and violated his federal constitutional rights by excluding certain out-of-court statements defendant made, e.g., that demons were coming after him, and admitting other out-of-court statements establishing the same, but limited the jury's consideration of these statements to circumstantially prove defendant's state of mind, rather than allowing the jury to consider the statements to prove the truth of the matters asserted. The latter statements were properly admitted as circumstantial evidence of defendant's state of mind, i.e., that he was hallucinating, and *not* to prove demons were actually coming after him. And while certain statements were improperly excluded, the error was harmless

3

because the jury heard ample evidence to support the conclusion defendant was hallucinating. We also reject defendant's claim the trial court prejudicially erred and violated his constitutional rights by instructing the jury, during both the guilt and sanity phases of the trial, with a modified version of CALCRIM No. 360 regarding the testifying experts' reliance on out-of-court statements in forming their opinions. This contention is forfeited for failure to object to the modified instruction below; while we conclude the instruction was technically incorrect in certain respects, the error did not affect defendant's substantial rights. Defendant further asserts prosecutorial misconduct, including indirect comment on his failure to testify, requires reversal. This claim is also forfeited, and his alternative claim of ineffective assistance of counsel also fails. And while defendant did request an instruction informing the jury no adverse inference may be drawn from his failure to testify, the trial court's failure to provide such an instruction was harmless. Finally, defendant's claim of cumulative prejudice also fails.

We therefore affirm the judgment.

FACTS

Following the well-established rule of appellate review, we recite the facts in the light most favorable to the judgment. (*People v. Bogle* (1995) 41 Cal.App.4th 770, 775.) Because defendant pleaded both not guilty and not guilty by reason of insanity, trial was bifurcated into guilt and sanity phases in accordance with section 1026. (See *People v. Elmore* (2014) 59 Cal.4th 121, 140-141 (*Elmore*).) The vast majority of defendant's claims on appeal relate solely to the guilt phase. Indeed, in only one of his contentions does he claim an error that occurred in the guilt phase also occurred in the sanity phase. We therefore base our factual recitation solely on the evidence adduced during the guilt phase of the trial. Sanity phase evidence will be addressed, where relevant, in the discussion portion of the opinion.

4

### The Murder

In October 2011, defendant lived with his mother and father, Kathleen and Thomas McGehee, in Manteca.[2] He was 26 years old. While defendant previously worked as a music instructor and server at a local restaurant, his employment "ground to a halt" earlier in the year. Defendant's younger sister, Katelyn, also lived at the house, having moved back home the previous month after completing a master's degree program. Thomas frequently traveled for business and was out of town during the latter part of October.

On Friday, October 28, Katelyn went to a weekend church retreat with her friend, Samantha. Defendant was home when Samantha came to pick Katelyn up. Despite the fact defendant and Samantha "had been good friends and he had previously been a groomsman in her . . . wedding," defendant "seemed like he wasn't very comfortable" talking to her and "ended up leaving pretty quickly." Before Katelyn left for the retreat, her mother agreed to pick her up at the University of the Pacific (UOP) in Stockton the following Sunday, October 30. The plan was for Katelyn to call her mother about an hour before she arrived at the school.

The morning of October 30, Kathleen went to church with one of defendant's older brothers, Justin, and his family. Sometime during the day, she called another of defendant's older brothers, Colin, and left him a voicemail. Colin returned her call around 4:00 p.m. She was making jambalaya for a potluck the following day and needed instructions on how to use the rice cooker Colin left at his parents' house when he moved out. The potluck was part of a victims advocacy training program; Kathleen signed up to become a volunteer advocate in the program through her church. Colin provided his

---

**2** Because of their common last name, we refer to members of defendant's family by their first names.

mother with the requested instructions.  Kathleen mentioned during the phone call that she planned to pick Katelyn up that evening.  Colin described his mother's mood as "very good."

Around 5:00 p.m., Katelyn called her mother to let her know she was about an hour away from UOP.  There was no answer so Katelyn left a message on the home answering machine.  A few minutes later, she received a call from defendant's cell phone, but the call ended "almost immediately."  Katelyn thought the call was a mistake because defendant "almost never" called her, so she did not try to call him back.  Instead, she called her mother's cell phone, which also went unanswered.  Katelyn left a voicemail.  About a minute later, she received another call from defendant, who claimed he was "just calling to see how [she was]."  Katelyn told him she had been trying to reach their mother to pick her up.  Defendant responded:  "Oh, yeah, I think the home phone hasn't really been working."  Katelyn said she also tried their mother's cell phone.  Defendant responded:  "Oh, yeah, I don't think that's been working, either.  I think she's having trouble with those two."  Assuming defendant was home, Katelyn asked him to find out whether their mother was still coming to pick her up.  Defendant replied sternly:  "I'm not at home, Katelyn.  I'm not at home."  Katelyn then asked defendant whether their mother asked him to pick her up.  Defendant denied having been asked to do so before ending the call.  Katelyn found the conversation to be "bizarre" because defendant rarely called her, and especially not "to just chat."  A couple minutes later, Katelyn tried the home phone again and left another message.

Closer to 6:00 p.m., as Katelyn was approaching UOP, she called the home phone three more times, leaving a final message, and also tried her mother's cell phone once more.  Two minutes after Katelyn's last message on the answering machine, defendant again called her.  This time, defendant said:  "Oh, you know what?  We actually sort of

6

talked about that, like maybe we had talked about maybe I could come pick you up." Defendant also "made a few remarks about how [their mother] had just been seeming kind of tired that day." Katelyn agreed to have defendant pick her up and hung up the phone.

Kathleen was murdered in her bedroom sometime between her conversation with Colin and Katelyn's missed calls. She was stabbed ten times in the neck, chest, and abdomen. There was also evidence of neck compression. Strong circumstantial evidence pointed to defendant as the murderer, including the fact the jacket defendant was wearing when he was arrested two days later had his mother's blood on it, there was no sign of a break-in at the house, Kathleen's bedroom was "neat, orderly, nothing appeared to have been taken or broken," defendant was the only other family member at the house that weekend, the strange phone calls between defendant and Katelyn described above, and his equally strange and incriminating behavior after he picked her up at UOP, which we recount immediately below.

### *Defendant's Attempts to Prevent Discovery of the Body*

Katelyn's friend Samantha and Samantha's husband, Ben, waited with Katelyn until defendant arrived at about 6:30 p.m. Katelyn and Samantha were walking another girl to her apartment near the UOP campus when defendant pulled into the parking lot. Defendant engaged in "small talk" with Ben while he waited for Katelyn to get back, but Ben "got the impression he didn't want to really talk." When Katelyn and Samantha returned and joined the conversation, defendant "started looking elsewhere" and "seemed uncomfortable." Samantha and Ben then helped Katelyn get her bags loaded into defendant's car.

As defendant and Katelyn drove away, defendant said he had "some errands" to run, including picking up his "medicine," which Katelyn understood to be marijuana.

7

Katelyn assumed these would be local errands. Instead, defendant got on the freeway and headed north to Sacramento. During the drive, defendant seemed "more social" than he had been in recent years. Katelyn described: "He actually seemed like he was in a good mood. He seemed cheerful. He was talkative and chatty and just seeming like very casual." Defendant talked "positively" about their mother, saying: "Oh, yeah, she's been doing great on her diet. She's lost 21 pounds in the last four weeks, but this diet she's doing it's only like 500 calories a day. She's been acting really tired lately. I think it's not enough calories for her. She's been seeming really tired."

At some point, Katelyn mentioned her lips were chapped. Defendant offered to stop at a drugstore so she could pick up some Blistex, which surprised Katelyn because defendant rarely offered to do things for people, at least during the previous few months. When defendant stopped at a Walgreens in Sacramento, Katelyn went inside, bought the Blistex, and used the restroom at the store. She then returned to the car, but defendant was not there. Katelyn found defendant inside the store, "sort of pacing the aisles."

After Walgreens, defendant and Katelyn drove to a fast food restaurant to get some food. They ate in the car on the way to pick up the marijuana, but defendant appeared to be lost. He apologized and said: "I usually come out here in the daylight, but it's dark this time, so I'm -- it's throwing me off a little bit." After about an hour of "driving up and down . . . the same few streets," Katelyn asked defendant: "Is there a specific street that you're looking for?" They arrived at the apparent destination soon thereafter, which was "maybe a minute or two away" from where they started at the Walgreens. Defendant parked at a Mexican restaurant and said: "I know this might seem a little strange, but Mom understands. We've done this before. I need to park here and walk to where I'm going to go." Katelyn stayed in the car and locked the doors.

8

Defendant returned from wherever he went about 20 minutes later and said he vomited during the walk back to the car.

Defendant then drove Katelyn back to their home in Manteca, arriving just before 11:00 p.m., about four hours after they left UOP. Katelyn unloaded her bags in her room and then walked to the bathroom. Defendant stopped her in the hallway and said: "Katelyn, Mom's asleep." Katelyn described his tone as "abrupt and urgent." She found the warning to be strange since she assumed their mother was asleep and did not normally bother her in the middle of the night. Katelyn used the bathroom and then returned to her room. At various points later in the night, she left her room and found defendant "sort of pacing in the hallways."

The next morning, defendant was already up when Katelyn emerged from her room. He asked whether she got his text message. Katelyn's cell phone died the night before, so she had not. Defendant explained he texted her earlier in the morning to say their mother got up at 5:00 or 6:00 a.m. and told him she had not slept well so she would be staying in bed for the day. When defendant went outside for a few minutes, Katelyn knocked lightly on their mother's door and called for her, but did not receive a response. She tried to open the door, but it was locked. Concerned, but also conflicted because of what defendant told her about their mother not sleeping well the night before, Katelyn knocked a little louder and again called for her mother, but again received no response. Katelyn then went outside to try to look into her mother's window, but the shutters were closed. Feeling like she was being "paranoid" because she did not have any reason to disbelieve defendant, Katelyn returned to her room. She then went about her day.

At defendant's suggestion, which he claimed was a request their mother made earlier that morning, defendant drove Katelyn to the bank so she could take care of an errand there. Katelyn described his demeanor as "much like the previous night,"

9

explaining: "He was being unusually, you know, cheerful, seeming -- being chatty and just, you know, eager to have conversations, and just being very casual." After Katelyn was done at the bank, defendant asked if she needed to go anywhere else, suggesting Target. Katelyn said she did not need to go to Target and asked if he did. Defendant answered: "Not really. Just for fun. Just to go walk around Target." Katelyn then asked to go to the AT&T store located on the way back to the house to buy a phone charger. Defendant suggested they go to a different AT&T store farther away from the house. After picking up the charger, they returned home. Katelyn then went out to lunch with a friend. When she returned later in the afternoon, defendant was not home.

Around 5:30 p.m., still seeing no sign of her mother, Katelyn decided to check on her again. Knocking on her door and calling for her, progressively louder with each attempt, Katelyn again received no response. She then called her brother Justin, who told her to call 911, which she did. Emergency responders arrived a short time later, broke the lock off the bedroom door, and found Kathleen's body in the condition previously described. Police were then dispatched to the scene. Defendant was arrested early the next morning. As mentioned, his mother's blood was on his jacket when he was taken into custody.

### State of Mind Evidence

In college, defendant was "energetic," "outgoing," "friendly and sociable." This began to change sometime between 2008 and 2010. According to Katelyn, he became reticent to engage in social interaction and was "not very cheerful." During the two months Katelyn was back home before the murder, she and defendant "had barely spoken." However, she did see defendant being "disrespectful" to their mother on more than one occasion during these two months. The worst such incident involved defendant, in Katelyn's words, "just berating her and belittling her." Katelyn continued: "She

10

would speak up for herself sometimes, but [defendant] would usually just stare her down, and he just was more powerful with words than she was."

Defendant's older brother Justin testified to changes he observed in defendant's physical movements, placing the onset of these changes around April 2011. That month, police officers responded to their parents' house based on a reported disturbance between defendant and their father that apparently involved defendant's belief his parents could not kick him out of the house without initiating eviction proceedings; one of the responding officers informed defendant he could in fact be removed from the house without such proceedings. According to Justin, it was after this incident that defendant's physical movements changed. Justin described: "I observed him begin to exhibit a lot of physical mannerisms, physical behaviors that I hadn't seen before, and it was very sudden, sudden emerging of those things, not a very gradual one. It was very sudden. He began exhibiting lots of shaking mannerisms. He would look off to the side. He would talk differently, in a stuttering, halting way." Justin also explained he had seen similar mannerisms in an uncle, Kathleen's brother, who had previously died of Parkinson's disease. However, unlike his uncle's symptoms, defendant's mannerisms appeared to come and go. Justin described an incident in which defendant was reading a children's book to Justin's children when they were over at the house: "I observed as he sat down to read to them and he began talking, all of his stuttering stopped and all of his physical shaking stopped. . . . [¶] . . . I saw his body go from completely normal, functioning normally, to suddenly resuming all of those physical shaking and eye movements and voice shaking. It went from on to off as he was reading and all the way back on when he was done."

Justin also testified to a change in his mother's behavior before the murder. He explained she was a "caretaker" for both her brother who died of Parkinson's disease and

11

her sister who died of a brain tumor, and she gravitated towards caring for defendant after her siblings passed away. According to Justin, his mother treated her children "very differently" depending on "how much life difficulty she believed [they] were experiencing," and based on that criterion, defendant received the most attention from her. Justin described her as "far more protective of him . . . than she was . . . of everyone else in her life put together." She also actively avoided conflict and made decisions based on whether the decision would upset anyone. However, when she began training to become a victim's advocate, she "began to be more assertive." Justin explained he "observed her begin to say and do little things that were the kinds of things that would make someone mad because she believed it needed to be said or done," which was something she would never have done in the past.

Defendant saw a psychiatrist, Dr. John Yarbrough, on two occasions during the weeks preceding the murder. Dr. Yarbrough described defendant as "noticeably agitated" during the first interview, elaborating: "He was writhing, moving. He looked very restless, very uncomfortable. That was pretty much throughout the interview. And at different parts of the interview when we were talking about things that were very difficult to talk [about] he would demonstrate difficulty breathing, and it was very difficult even for someone to talk to him and watch the struggle that he was going through." Dr. Yarbrough diagnosed defendant as having post-traumatic stress disorder (PTSD) and conversion disorder, the latter diagnosis pertaining to the abnormal physical movements that had no known medical reason. Defendant was taking Celexa, an anti-depressant, prior to the first appointment. Dr. Yarbrough increased the dosage and added another medication, Klonopin, for the anxiety. Two weeks later, defendant came back for a follow-up appointment. His abnormal movements were slightly decreased during

12

the second interview, but were "still quite visible." During neither appointment did defendant complain of auditory or visual hallucinations.

Based on the foregoing, and on expert testimony from Dr. Kent Rogerson, a psychiatrist who evaluated defendant following the murder and concluded he did not have a psychotic disorder, but instead suffered from "marijuana dependence in institutional remission[,] anxiety disorder with panic attacks and psychosomatic symptomatology, [and] adjustment disorder with anxiety and depression," the prosecution argued to the jury that defendant killed his mother with malice and with premeditation and deliberation. According to the prosecution's theory, defendant's mother was his caregiver and defender, at least until the incident that brought the police to the house the April before the murder. During that incident, defendant's mother did not come to his defense, but instead took her husband's side and acquiesced in defendant being told he could be kicked out at any time. From that point on, defendant started to mimic the symptoms of Parkinson's disease he saw his uncle exhibit in an attempt to gain his mother's sympathy. At the same time, his mother was becoming more assertive due to her victim's advocacy training, which led to confrontations with defendant, and ultimately to him stabbing her to death.

The defense theory was that defendant, if he killed his mother at all, did so because of hallucinations that demons were coming after him, negating the element of malice required for murder and the elements of premeditation and deliberation required for first degree murder. This theory was based on the following evidence.

Dr. Wendy Weiss, a psychologist appointed by the trial court to evaluate defendant, testified he suffered from schizophrenia. She based this diagnosis on her review of the police case file, defendant's previous psychiatric records, and an interview with defendant she conducted at the jail. During the interview, defendant's grooming

13

was "sloppy" and he made "odd gestures" with his hands, "rubbing his left arm with his right hand and . . . rubbing his abdomen in an unusual manner." Defendant also "complained a lot about physical discomfort," explaining he felt like there was "fire on his skin" and "blades under his fingernails." Defendant's history revealed he saw a psychiatrist in 2010, "complaining of anxiety and hallucinations," was diagnosed with an unspecified "psychotic disorder," and prescribed Perphenazine, an antipsychotic medication. He also reported hallucinations to at least one therapist he saw around the same time. Dr. Weiss also reviewed defendant's journal, which contained "voluminous" references to religious concepts that Dr. Weiss concluded, "went well beyond simply having religious beliefs." In the journal, defendant recounted visions in which Jesus and the Holy Spirit visited him in different forms. However, at some point, the visions or hallucinations became darker, involving "being basically haunted by demons."

Two of defendant's friends, Andrew Green and Jeffrey Moorehouse, also testified he complained of being tormented by demons. Green described an incident in which defendant showed up on his doorstep in the middle of the night wearing pajamas and saying, "there were demons after him, actual live demons." Green allowed defendant to spend the night on his couch, explaining: "He looked very disheveled. He began to twitch around. He said [the demons] were actually physically attacking him. He was scared. He didn't want to go home." Defendant also told Moorehouse about the demons. According to Green and Moorehouse, defendant also began to talk to himself, as though he were having a conversation with someone who was not there. Green further confirmed defendant made "shuddering" and "twitching" movements. Eventually, defendant stopped spending time with Green and Moorehouse altogether.

Defendant's older brother Colin also testified during cross-examination that, beginning sometime in 2010, while Colin visited home, defendant would sometimes walk

14

around the house at night, in the dark, wearing a Halloween-style mask and coveralls. Colin described two specific instances in which defendant walked into a room at the house wearing such a mask, for no apparent reason. On a third occasion, the previous April, Colin and defendant went to a horror movie together. While they began the movie sitting next to each other, defendant eventually got up and walked away from his seat. Colin did not see him for a while and got up to look around the theater. He spotted defendant sitting alone, in a different row and off to the side, again wearing a mask.

The jury found defendant guilty of second degree murder. Following the sanity phase of the trial, the jury found he was legally sane when he committed the crime.

DISCUSSION

I

*Combination of CALCRIM No. 362 and CALCRIM No. 3428*

Defendant contends the trial court prejudicially erred and violated his federal constitutional right to due process by instructing the jury, during the guilt phase of the trial, with CALCRIM No. 362 on consciousness of guilt along with CALCRIM No. 3428 on the limited use of evidence of mental illness or impairment. Defendant did not object to these instructions at trial. "Failure to object to instructional error forfeits the issue on appeal unless the error affects defendant's substantial rights. [Citations.] The question is whether the error resulted in a miscarriage of justice under *People v. Watson* (1956) 46 Cal.2d 818, 299 P.2d 243. [Citation.]" (*People v. Anderson, supra,* 152 Cal.App.4th at p. 927.) We conclude there was error, but no miscarriage of justice. The claim is therefore forfeited.

As given to the jury in this case, CALCRIM No. 362 provided: "If the defendant made a false or misleading statement before this trial related to the charged crime, knowing the statement was false or intended to be -- to mislead, that conduct may show

15

he was aware of his guilt of the crime and you may consider it in the determining of his guilt. [¶] If you conclude that the defendant made the statement, it is up to you to decide its meaning and importance. However, evidence that the defendant made such a statement cannot prove guilt by itself." CALCRIM No. 3428, as given to the jury, provided: "You have heard evidence that the defendant suffered from a mental disease or defect or disorder. You may consider this evidence *only for the limited purpose of deciding whether at the time of the charged crime, the defendant acted with the intent or mental state required for that crime*. [¶] The People have the burden of proving beyond a reasonable doubt that the defendant acted with the required intent or mental state, specifically express or implied malice aforethought. If the People have not met this burden, you must find the defendant not guilty of murder." (Italics added.)

Defendant argues the trial court should have modified CALCRIM No. 3428 to allow the jury to consider evidence of defendant's mental disturbance in determining whether the false statements he made to Katelyn following the murder (i.e., their mother asked him to pick Katelyn up at UOP, she was asleep when defendant and Katelyn returned home later that night, she got up early the next morning and told defendant she would be spending the day in bed, and she asked defendant to take Katelyn to run an errand at the bank) were knowingly false, and therefore evidenced his consciousness of guilt. We agree.

In *People v. Wiidanen* (2011) 201 Cal.App.4th 526 (*Wiidanen*), the defendant was convicted of orally copulating an unconscious person. He was intoxicated at the time of the crime. (*Id*. at p. 528.) When interviewed by police a few hours later, the defendant repeatedly denied he orally copulated anyone. (*Id*. at p. 533.) We held "the trial court erred in instructing the jury with both the consciousness of guilt instruction (CALCRIM No. 362) and an unmodified version of the voluntary intoxication instruction (CALCRIM

16

No. 3426)" (*id*. at p. 528) that informed the jury it may consider evidence of the defendant's voluntary intoxication "only in deciding whether the defendant had the knowledge that the victim was unconscious of the act at the time of its occurrence." (*Id*. at p. 533, fn. 5.) As we explained, prohibiting the jury from considering evidence of the defendant's voluntary intoxication for any purpose other than deciding whether he knew the victim was unconscious of the oral copulation was error because such evidence was also probative of whether or not the defendant's denials to police were knowingly false and therefore evidenced his consciousness of guilt. (*Id*. at p. 533.)

Similarly, here, CALCRIM No. 3428 prohibited the jury from considering evidence of defendant's mental illness or impairment for any purpose other than deciding whether he possessed the required mental state for murder. Like intoxication, mental illness or impairment has obvious relevance to the question of ability to perceive or recall events. (See *People v. Gurule* (2002) 28 Cal.4th 557, 591-592 [mental illness can be relevant on the issue of credibility if such illness affects the witness's ability to perceive, recall or describe events]; *People v. Lewis* (2001) 26 Cal.4th 334, 356-357 [insane delusions of a witness relevant to the jury's assessment of the witness's ability to perceive and recollect events].) Here, defendant presented evidence he was suffering from insane delusions at the time he stabbed his mother to death. Shortly after the murder, as Katelyn was trying to reach her mother to pick her up at UOP, defendant called Katelyn and said their mother had asked him to pick her up. Later that night, defendant stopped Katelyn in the hallway and told her their mother was asleep. The next morning, defendant told Katelyn their mother got up early, asked defendant to take Katelyn to run an errand at the bank, and then said she would be staying in bed all day because she had not slept well. None of these statements was true. If defendant knew them to be false, they would be evidence of his consciousness of guilt. If, however,

17

defendant's mental illness or impairment prevented him from knowing those statements were false, the statements would not have been probative of his consciousness of guilt. The jury should have been allowed to consider the evidence of defendant's mental illness or impairment for purposes of assessing consciousness of guilt. (See *Wiidanen*, *supra*, 201 Cal.App.4th at p. 533.)

Defendant also argues the combination of CALCRIM Nos. 362 and 3428 created an "irrational permissive inference" in violation of his right to due process under the federal Constitution. Not so. As we explained in *Wiidanen*, *supra*, 201 Cal.App.4th 526, " '[a] permissive inference violates the Due Process Clause only if the suggested conclusion is not one that reason and common sense justify *in light of the proven facts before the jury*.' [Citation.]" (*Id*. at p. 533, italics added.) We concluded there was no due process violation in *Wiidanen* "because the 'suggested conclusion,' i.e., defendant was aware of his guilt when he made the false statements, was reasonable 'in light of the proven facts before the jury,'" explaining: "It was not reasonable that defendant made these false statements due to his intoxication (and therefore without knowledge they were false) because, as pointed out by the prosecutor during closing argument, defendant selectively remembered certain things about what allegedly happened at the party that, if believed, would exculpate him (i.e., he did not orally copulate anybody) but claimed a hazy memory about other facts (i.e., whether he returned to the house that night) that would not necessarily inculpate or exculpate him. That defendant had the ability to fake a clear memory about events that exculpated him and to fake a hazy memory about neutral facts suggested defendant knew how to contrive even while allegedly drunk. Therefore, the permissive inference, i.e., defendant was aware of his guilt when he made the false statements, was reasonable, and the court did not violate defendant's due process rights by giving these instructions." (*Id*. at p. 534.)

18

Here, too, the suggested conclusion defendant was aware of his guilt when he made the false statements at issue in this case was reasonable in light of the proven facts before the jury. Indeed, we conclude such a conclusion was more reasonable in this case than in *Wiidanen, supra,* 201 Cal.App.4th 526. In addition to making the false statements, defendant engaged in a concerted effort to keep Katelyn away from their deceased mother. He picked Katelyn up at UOP and, rather than drive her home, defendant took her on a four-hour road trip to Sacramento, purportedly to pick up marijuana. When Katelyn mentioned her lips were chapped, defendant stopped at Walgreens to allow her to purchase Blistex, which was contrary to his usual reluctance to do things for people. He then paced the aisles when Katelyn was in the restroom. Back on the road, defendant drove back and forth down the same street, claiming to be lost. When he eventually arrived at the purported location, defendant parked the car and disappeared on foot. Defendant did not drive Katelyn back to the house until after the time their mother usually retired to her bedroom, which gave defendant the pretext to tell Katelyn not to disturb her while she slept. Defendant also seemed to be patrolling the hallway that night. The following day, defendant told Katelyn their mother got up early and told him she would be staying in bed all day, but she wanted him to take Katelyn to run an errand at the bank. While defendant and Katelyn ran that errand, defendant also asked if Katelyn wanted to go to Target to just walk around. Finally, when Katelyn said she did not need to go to Target, but wanted to go to the AT&T store on the way back to the house, defendant suggested they go to a different store location, farther from the house. There would be no reason for defendant to have engaged in this effort to keep Katelyn away from their mother if he actually believed she were alive. Thus, the permissive inference that defendant was aware of his guilt when he made the false

19

statements was reasonable, and the trial court did not violate his due process rights by giving the challenged instructions.

As we concluded in *Wiidanen*: "For the same reason the instructions did not violate due process, the error in giving these instructions was harmless under the state law standard articulated in *People v. Watson* (1956) 46 Cal.2d 818, 299 P.2d 243. Namely, it was not 'reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' [Citation.]" (*Wiidanen*, *supra*, 201 Cal.App.4th at p. 534.) This also means the error did not affect defendant's substantial rights. (*People v. Anderson, supra,* 152 Cal.App.4th at p. 927.) Therefore, the claim is forfeited.[3]

## II

### *Failure to Instruct on Involuntary Manslaughter*

Defendant also claims the trial court prejudicially erred by failing to instruct the jury, sua sponte, on involuntary manslaughter as a lesser included offense to murder. We disagree.

In a criminal case, the trial court "must instruct on lesser included offenses, even in the absence of a request, whenever there is substantial evidence raising a question as to whether all of the elements of the charged offense are present. [Citations.] 'Substantial evidence is evidence sufficient to "deserve consideration by the jury," that is, evidence

---

[3]    Anticipating forfeiture, defendant also claims his trial counsel rendered constitutionally deficient assistance by failing to object to these instructions. Because such a claim requires a showing of prejudice, i.e., a reasonable probability of a more favorable result but for counsel's unprofessional errors (see *Strickland v. Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 693] (*Strickland*)), and because we have concluded there was no such probability, defendant's claim of ineffective assistance of counsel also fails.

that a reasonable jury could find persuasive.' [Citation.]" (*People v. Lewis* (2001) 25 Cal.4th 610, 645; *People v. Souza* (2012) 54 Cal.4th 90, 114.) "On appeal, we review independently whether the trial court erred in failing to instruct on a lesser included offense." (*People v. Booker* (2011) 51 Cal.4th 141, 181.)

"Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) "Such malice may be express or implied." (§ 188.) Our Supreme Court has explained express malice "requires an *intent to kill* that is 'unlawful' because . . . ' "there is no justification, excuse, or mitigation for the killing recognized by the law." ' [Citation.] [¶] Malice is implied when an unlawful killing results from a willful act, the natural and probable consequences of which are dangerous to human life, performed with conscious disregard for that danger. [Citations.]" (*People v. Elmore* (2014) 59 Cal.4th 121, 133 (*Elmore*).)

"Manslaughter is the unlawful killing of a human being without malice." (§ 192.) "A defendant commits voluntary manslaughter when a homicide that is committed either with intent to kill or with conscious disregard for life—and therefore would normally constitute murder—is nevertheless reduced or mitigated to manslaughter." (*People v. Bryant* (2013) 56 Cal.4th 959, 968.) "Two factors may preclude the formation of malice and reduce murder to voluntary manslaughter: heat of passion and unreasonable self-defense." (*Elmore*, *supra*, 59 Cal.4th at p. 133.) Prior to 1981, a third factor mitigating an intentional killing to voluntary manslaughter was diminished capacity. (See *Bryant*, *supra*, 56 Cal.4th at pp. 969-970; see also *People v. Saille* (1991) 54 Cal.3d 1103, 1110-1111 (*Saille*).)

"Involuntary manslaughter is 'the unlawful killing of a human being without malice aforethought *and without an intent to kill*.' [Citation.]" (*People v. Rogers* (2006) 39 Cal.4th 826, 884 (*Rogers*), italics added.) While diminished capacity no longer

21

mitigates an intentional killing to voluntary manslaughter (*Saille*, *supra*, 54 Cal.3d at p. 1114), a defendant "is still free to show that because of his [or her] mental illness or voluntary intoxication, he [or she] did not *in fact* form the intent unlawfully to kill (i.e., did not have malice aforethought). [Citation.] In a murder case, if this evidence is believed, the only supportable verdict would be involuntary manslaughter or an acquittal. If such a showing gives rise to a reasonable doubt, the killing (assuming there is no implied malice) can be no greater than involuntary manslaughter." (*Id.* at p. 1117; see also § 28, subd. (a) ["Evidence of mental disease, mental defect, or mental disorder is admissible solely on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged"].)

Thus, in a murder case, instructions on involuntary manslaughter are required where there is substantial evidence that may come in the form of evidence of the defendant's mental illness, raising a question as to whether or not that defendant actually formed the intent to kill. (*Rogers*, *supra*, 39 Cal.4th at p. 884.)

Here, defendant stabbed his mother ten times in the neck, chest, and abdomen. Eight of these stab wounds were independently fatal. There was also evidence of neck compression. The medical examiner aptly described the infliction of these injuries as "overkill." There can be no serious dispute defendant intended to kill when he did this to his mother. Nor does defendant claim he lacked an intent to kill. Instead, defendant argues: "If [he] believed, due to a hallucination or delusion, that he was being tormented and attacked by a demon, as he had hallucinated in the past, the killing would be without express or implied malice, because he did not believe that he was acting against a human life." This argument is foreclosed by the reasoning of *Elmore*, *supra*, 59 Cal.4th 121, as we explain immediately below.

22

In *Elmore*, *supra*, 59 Cal.4th 121, the mentally ill defendant stabbed a woman to death at a bus stop with a sharpened paint brush handle. He claimed at trial certain unspecified delusions made him actually, although unreasonably, believe he needed to defend himself. After requested instructions on imperfect self-defense voluntary manslaughter were refused, the defendant was convicted of first degree murder. (*Id*. at p. 130-132.) Our Supreme Court held the instructions were properly refused because the imperfect self-defense theory, "a form of mistake of fact," has "no application when the defendant's actions are entirely delusional," explaining: "A defendant who makes a factual mistake misperceives the objective circumstances. A delusional defendant holds a belief that is divorced from the circumstances. . . . Unreasonable self-defense was never intended to encompass reactions to threats that exist only in the defendant's mind." (*Id*. at pp. 136-137.)

The court then rejected the defendant's argument, similar to the one made in this case, that section 28, subdivision (a), allowed him to introduce evidence of his mental illness, which "gave rise to his belief in the need for self-defense, and precluded him from actually harboring malice." (*Elmore*, *supra*, 59 Cal.4th at p. 139.) Acknowledging such an interpretation of the section was "logically defensible" based on its plain meaning, the court concluded the statutory scheme as a whole and section 28's legislative history required a different result. (*Ibid*.) The court explained: "Under California's statutory scheme, '[p]ersons who are mentally incapacitated' are deemed unable to commit a crime as a matter of law. [Citation.] Mental incapacity . . . is determined by the *M'Naghten* test for legal insanity provided in section 25, subdivision (b). [Citations.] Under *M'Naghten*, insanity is established if the defendant was unable either to understand the nature and quality of the criminal act, or to distinguish right from wrong when the act was committed. [Citations.] [¶] A claim of unreasonable self-defense

23

based solely on delusion is quintessentially a claim of insanity under the *M'Naghten* standard of inability to distinguish right from wrong. Its rationale is that mental illness caused the defendant to perceive an illusory threat, form an actual belief in the need to kill in self-defense, and act on that belief without wrongful intent. [Citations.]" (*Id.* at p. 140.)

Where, as in *Elmore, supra,* 59 Cal.4th 121 and this case, a defendant pleads both not guilty and not guilty by reason of insanity, "[t]he trial is bifurcated, with the question of guilt tried first. The defendant is presumed innocent, of course, but in order to reserve the issue of sanity for the second phase of trial the defendant is also conclusively presumed to have been legally sane at the time of the offense. [Citations.] Evidence of the defendant's mental state may not be admitted at the guilt phase *to prove insanity*. [Citations.] If the defendant is found guilty, the trial proceeds to the sanity phase, where the defendant bears the burden of proof by a preponderance of the evidence. [Citations.] 'The separation of the two stages of the bifurcated trial is solely for the purpose of keeping the issues of guilt and sanity distinct; for other purposes, the trial is regarded as single and continuing.' [Citations.]" (*Elmore*, *supra*, 59 Cal.4th at pp. 140-141, italics added; see §§ 1020, 1026; see also *People v. Mills* (2012) 55 Cal.4th 663, 681 ["Legislature's intent in providing for bifurcation when a defendant pleads both not guilty and not guilty by reason of insanity was to *simplify* the issues before the jury, by 'remov[ing] entirely from the first stage of the trial any issue as to legal sanity'"].)

Thus, while section 28, subdivision (a), "allows defendants to introduce evidence of mental disorder to show they did not actually form a mental state required for guilt of the charged crime," this provision "is necessarily limited by the presumption of sanity, which operates at a trial on the question of guilt to bar the defendant from claiming he [or she] is not guilty *because he [or she] is legally insane*." (*Elmore*, *supra*, 59 Cal.4th at p.

24

141; italics added.)  That, the court concluded, is exactly what the defendant in *Elmore* attempted to do when he claimed imperfect self-defense based solely on delusion during the guilt phase of the trial:  "A claim of self-defense based solely on delusion is more than a claim of unreasonable self-defense; as we have shown, it is a claim of legal insanity.  If section 28(a) were applied to allow the defendant to make that claim at the guilt phase, the burden would shift to the prosecution to prove beyond a reasonable doubt that the defendant was not insane.  The statutory scheme would be turned on its head." (*Id*. at p. 145.)  Instead, only "relevant evidence of mental states *short of insanity* is admissible at the guilt phase under section 28(a)" to negate malice under an imperfect self-defense theory, e.g., where a defendant "mistakenly believed that *actual circumstances* required [his or her] defensive act . . . even if [the] reaction was distorted by mental illness." (*Id*. at p. 146, italics added.)  However, evidence that "purely delusional perceptions caused the defendant to believe in the necessity of self-defense" may be presented only during the sanity phase of the trial.  (*Ibid*.)

Here, while defendant makes a slightly different argument than the one advanced in *Elmore, supra,* 59 Cal.4th 121, the result is the same.  Defendant does not argue he was entitled to voluntary manslaughter instructions because substantial evidence supported the view he hallucinated an attack by a demon, and therefore actually, although unreasonably, believed in the need to use deadly force in self-defense.  Such an argument would be foreclosed by the holding in *Elmore*.  Instead, defendant argues he was entitled to involuntary manslaughter instructions because substantial evidence supported the view he hallucinated an attack by a demon, and therefore did not intend to kill *a human being*, but instead intended to kill a demon.  This too is quintessentially a claim of insanity.  Its rationale is that because of defendant's mental illness, he was unable to understand the

nature and quality of the criminal act, i.e., he was killing a human being rather than a demon. Such a claim may be made, but must be made during the sanity phase of the trial.

The trial court did not err in declining to provide the jury with involuntary manslaughter instructions.

## III

### *Hearsay Claim*

Defendant also claims the trial court prejudicially erred and violated his federal constitutional rights by excluding certain out-of-court statements made by defendant, e.g., demons were coming after him, and admitting other similar out-of-court statements, but limiting the jury's consideration of these statements to circumstantially prove defendant's state of mind, rather than allowing the jury to consider the statements for their truth. We disagree.

### A.

### *Additional Background*

Detective Wayne Miller with the Manteca Police Department testified during cross-examination that he looked through defendant's journal. When defense counsel asked the detective about the contents of the journal, the prosecutor objected on hearsay grounds, prompting defense counsel to respond: "Judge, it's not offered for the truth of the matter. It's going toward what the state of mind of the defendant was. I'm not saying demons were coming after him, but he believed they were." After an unreported bench conference, the trial court struck from the record defense counsel's reference to demons coming after defendant and admonished the jury not to consider counsel's comment for any purpose. Defense counsel then asked the detective whether defendant's journal was "mostly about religious topics," to which the detective answered: "Yes."

26

Two of defendant's friends, Green and Moorehouse, testified during the defense case. As previously indicated, these witnesses testified defendant told them demons were coming after him. Green described an incident in which defendant showed up on his doorstep in the middle of the night wearing pajamas and saying, "there were demons after him, actual live demons." Green allowed defendant to spend the night on his couch, explaining: "He said [the demons] were actually physically attacking him. He was scared. He didn't want to go home." Defendant also told Moorehouse about the demons. Prior to the testimony of these witnesses, the prosecutor objected to "either of these witnesses [coming] in and say[ing] the defendant told me he was having hallucinations." Based on defense counsel's offer of proof, the trial court allowed the witnesses to testify defendant told them demons were coming after him, explaining such out-of-court statements were not being admitted to prove the truth of the matter asserted, i.e., demons were actually coming after him, but rather as circumstantial evidence of defendant's state of mind. During the testimony, the trial court overruled multiple hearsay objections and instructed the jury the out-of-court statements were not being offered for their truth, but as circumstantial evidence defendant was having hallucinations. However, the trial court did sustain one such objection during Green's testimony, after which defense counsel indicated she would "move on." The trial court also sustained an unspecific objection lodged after Moorehouse testified defendant told him God was speaking to him directly.

In sum, through three witnesses, defense counsel sought to elicit several out-of-court statements from defendant, most of which were variations of the statement, "demons are coming after me." Most of these statements were admitted as circumstantial evidence of defendant's state of mind, i.e., defendant was having hallucinations, and the jury was so instructed. However, the prosecutor's hearsay objection was sustained on

two occasions, and a third unspecific objection to a similar out-of-court statement, "God speaks to me directly," was also sustained.

## B.

### *Analysis*

Defendant argues the foregoing out-of-court statements were admissible hearsay under the state of mind exception to the hearsay rule. He is mistaken. They are not hearsay at all.

Subject to numerous exceptions, "hearsay evidence is inadmissible." (Evid. Code, § 1200, subd. (b).) Such evidence is defined to mean "evidence of a statement that was made other than by a witness while testifying at the hearing *and that is offered to prove the truth of the matter stated*." (*Id*., subd. (a), italics added.) Under the state of mind exception to the hearsay rule, "evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation . . . is not made inadmissible by the hearsay rule when: [¶] (1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or [¶] (2) The evidence is offered to prove or explain acts or conduct of the declarant." (Evid. Code, § 1250, subd. (a).)[4] For example, had defendant in this case stated, "I am having hallucinations," this would be a statement of his then-existing state of mind offered to prove the truth of the matter stated, i.e., defendant was having hallucinations.

"In contrast, a statement which does not directly declare a mental state, but is merely circumstantial evidence of that state of mind, *is not hearsay*. It is not received for

---

[4] This exception is also subject to Evidence Code section 1252, which provides: "Evidence of a statement is inadmissible under this article if the statement was made under circumstances such as to indicate its lack of trustworthiness."

28

the truth of the matter stated, but rather whether the statement is true or not, the fact such statement was made is relevant to a determination of the declarant's state of mind." (*People v. Ortiz* (1995) 38 Cal.App.4th 377, 389, italics added.)  In the out-of-court statements offered into evidence in this case, defendant essentially stated, "demons are coming after me" and "God speaks to me directly."  While offered to prove defendant's state of mind, these statements do not directly declare that mental state, and are therefore not offered to prove the truth of the matter stated.  In other words, the statements were not offered to prove demons were coming after defendant or God was speaking to him directly.  Instead, the fact defendant made these statements was offered as circumstantial evidence of his state of mind, i.e., he was having hallucinations.  Indeed, defendant acknowledges in his opening brief:  "Obviously, [defendant's] claim that he saw demons was not offered to prove that he was encountering real demons."  Thus, the trial court correctly allowed most of the statements into evidence as non-hearsay statements relevant to prove defendant's mental state.  Moreover, we are more than a little perplexed defendant would challenge the trial court's ruling *admitting* these statements as nonhearsay circumstantial evidence of his state of mind simply because of his mistaken belief they were actually hearsay statements directly stating his mental state, and therefore admissible under the state of mind exception.  Either way, the statements *were admitted*, and for the very purpose sought below, i.e., to prove defendant's state of mind.

Where hearsay objections were sustained, the trial court was mistaken.  However, because the jury heard ample evidence defendant believed demons were coming after him, the error was harmless.  (See, e.g., *People v. Garcia* (2005) 134 Cal.App.4th 521, 540 [assuming exclusion of hearsay statement was error, it was harmless because the defense presented ample other evidence on the point for which the hearsay statement was offered].)

# IV

## *Modified CALCRIM No. 360*

Defendant's claim the trial court prejudicially erred and violated his federal constitutional rights by instructing the jury, during both the guilt and sanity phases of the trial, with a modified version of CALCRIM No. 360 regarding the testifying experts' reliance on out-of-court statements in forming their opinions is forfeited by his failure to object to the modified instruction below.

## A.

### *Additional Background*

Unmodified, CALCRIM No. 360 informs the jury a particular testifying expert considered certain out-of-court statements in reaching his or her conclusions as an expert, and instructs the jury to consider those out-of-court statements only to evaluate the expert's opinion and not as proof the information contained in the statements is true.

During the guilt phase instruction conference, the prosecutor requested a modification of this instruction so that a single instruction would apply to the testimony of Drs. Weiss, Yarbrough, and Rogerson. The modified instruction, as given to the jury, stated: "Dr. Weiss, Dr. Yarbrough and Dr. Rogerson each testified that in reaching his or her conclusion as an expert, he or she considered statements made by the defendant, statements by witnesses who testified about the defendant, and statements made by other persons who had knowledge about the defendant. You may consider those statements only to evaluate the expert's opinion. Do not consider those statements as proof that the information contained in the statements is true." The defense did not object to the modification.

The same modified instruction was given during the sanity phase of the trial, except that experts who testified during the sanity phase were named in that instruction. Again, the defense did not object to the modification.

**B.**

*Analysis*

We first note that because defendant did not object to the modifications below, the claim of error is forfeited unless "the error affects defendant's substantial rights," i.e., "resulted in a miscarriage of justice." (*People v. Anderson, supra,* 152 Cal.App.4th at p. 927.) We conclude there was error, but no miscarriage of justice. The claim is therefore forfeited.

Defendant argues that because the modified instruction included "statements by witnesses who testified about the defendant" and instructed the jury to consider those statements "only to evaluate the expert's opinion," the instruction "effectively precluded the jury from considering actual trial testimony, including [testimony] about [defendant's] mental condition [which] supported Dr. Weiss's opinion that [he] suffered from schizophrenia prior to and at the time of the offense." He further argues the claimed instructional error amounted to a violation of due process because another instruction, CALCRIM No. 332, informed the jury to "disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence," and defendant's "mental defect defense was primarily dependent upon Dr. Weiss's diagnosis of schizophrenia, which required a history of hallucinations and delusions," testimony as to which defendant claims the jury was precluded from considering for its truth by modified CALCRIM No. 360.

We disagree with defendant's interpretation of the instruction. A reasonable juror would have understood CALCRIM No. 360 to be referring to *out-of-court statements*

31

made to the testifying expert.  The fact certain witnesses testified about defendant's mental condition does not render any out-of-court statements made to a testifying expert admissible for the truth of the matters stated in those out-of-court statements.  It was those out-of-court statements the instruction told the jury to consider only to evaluate the expert's opinion.  What was admissible for all purposes was their actual trial testimony.  No reasonable juror would have understood the instruction to preclude the jury from considering such testimony.  For this reason, the combination of modified CALCRIM No. 360 and CALCRIM No. 332 did not violate defendant's federal constitutional right to due process.

Defendant also claims the modified version of CALCRIM No. 360 improperly precluded the jury from considering admissible hearsay statements made by defendant to Dr. Yarbrough.  Specifically, he argues that because Dr. Yarbrough was called as a prosecution witness, out-of-court statements made to him by defendant were admissible under the party admission exception to the hearsay rule, and therefore those statements should have been excluded from the scope of the modified instruction.  We agree, but conclude the error was harmless.

CALCRIM No. 360's bench notes explain:  "This instruction should not be given if all of the statements relied on by the expert were admitted under applicable hearsay exceptions."  Because the only out-of-court statements relied upon by Dr. Yarbrough were made by defendant, and these statements were admissible for their truth as admissions by a party opponent (see *People v. Ledesma* (2006) 39 Cal.4th 641, 700, fn. 15; Evid. Code, § 1220), Dr. Yarbrough's name should have been excluded from the modified instruction.  Defendant asserts the error was prejudicial because defendant told Dr. Yarbrough he was experiencing pain during the interview, which Dr. Yarbrough concluded was genuine based on defendant's demeanor and physical movements, and Dr.

32

Weiss, in turn, relied in part on defendant's complaint of pain to Dr. Yarbrough to support her diagnosis of schizophrenia. We disagree.

Even with the inclusion of Dr. Yarbrough's name in the modified instruction, such that the jury was precluded from considering defendant's *statements* to the doctor for their truth, the jury was not precluded from considering Dr. Yarbrough's *observations* of defendant, which also evidenced the fact he was experiencing pain during the interview. Moreover, the lynchpin of defendant's prejudice argument is the purported fact Dr. Weiss relied on defendant's *statements* to Dr. Yarbrough, but this simply is not true. As the Attorney General points out, Dr. Weiss testified she relied on Dr. Yarbrough's *records*, which included his conclusion defendant was suffering from psychosomatic pain, not Dr. Yarbrough's *testimony* concerning defendant's *statement* to him that he was experiencing such pain. Because Dr. Yarbrough's records were hearsay and admissible through Dr. Weiss's testimony not for their truth, but only for the limited purpose of evaluating that testimony, the jury was properly instructed with CALCRIM No. 360 as to Dr. Weiss's review of those records. Thus, the error in precluding the jury from considering defendant's complaint of pain to Dr. Yarbrough for the truth of the complaint would not have affected the jury's consideration of Dr. Weiss's testimony. In any event, as we have explained, Dr. Yarbrough's observations of defendant also supported his conclusion defendant was genuinely experiencing pain. We therefore conclude the inclusion of Dr. Yarbrough's name in the modified version of CALCRIM No. 360 did not result in a miscarriage of justice.

Finally, defendant complains the modified instruction credited prosecution experts with relying on material they did not actually consider. While technically true, we conclude this error was harmless as well. As defendant correctly notes, the modified instruction stated: "Dr. Weiss, Dr. Yarbrough and Dr. Rogerson *each testified* that in

33

reaching his or her conclusion as an expert, *he or she considered* statements made by the defendant, statements by witnesses who testified about the defendant, *and* statements made by other persons who had knowledge about the defendant." (Italics added.) By making the instruction applicable to each expert witness, the modification states each such witness considered out-of-court statements made by each category of declarant, i.e., defendant, testifying witnesses, and other persons who had knowledge about defendant. Defendant argues that whereas the modified instruction was correct as to Dr. Weiss, the prosecution experts did not consider out-of-court statements made by the latter two categories of declarant at all; therefore, the modified instruction "misled jurors to believe that the other two relied on the same evidence that Dr. Weiss relied on, . . . and that their conclusions were as informed as Dr. Weiss's conclusion."

Viewing the instructions as a whole, as we must, we conclude a reasonable juror would not have been so misled. This is because the jury was also instructed to "weigh each opinion against the others" and "examine the reasons given for each opinion and the facts or other matters on which each witness relied." At the start of each witness's testimony, the jury learned the basis of that testimony. The jury was also instructed that some of the instructions "may not apply, depending on [the jury's] findings about the facts." We conclude the jury would have read these instructions together and determined that, because Drs. Yarbrough and Rogerson did not testify that they based their expert opinions on out-of-court statements made by testifying witnesses or other persons with knowledge about defendant, that portion of modified CALCRIM No. 360 did not apply and the jury was required to examine their testimony based on the information upon which they did rely. Thus, while the modified instruction was technically incorrect in this respect as well, there is no reasonable probability the jury was misled in the way defendant suggests.

34

In sum, while the modifications made to CALCRIM No. 360 were erroneous in the ways described above, there was no miscarriage of justice. For the same reasons, we reach the same conclusion with respect to the modified instruction provided during the sanity phase. Accordingly, defendant's failure to object to the error forfeits the claim on appeal.[5]

# V

## *Prosecutorial Misconduct and Related Instructional Error*

We address defendant's next two contentions together. He claims prejudicial prosecutorial misconduct, including improper comment on defendant's failure to testify, requires reversal, and further asserts the trial court also violated his federal constitutional rights by failing to instruct the jury no adverse inference may be drawn from his failure to testify. Defendant's prosecutorial misconduct claims are forfeited for failure to object and request a curative admonition below. We also reject defendant's alternative assertion of ineffective assistance of counsel. While his related claim of instructional error has merit, we conclude the error was harmless.

## A.

### *Additional Background*

The prosecutor argued during her closing argument that this case was not about who killed defendant's mother. Defendant stabbed her to death. The main question for the jury to resolve, the prosecutor argued, was defendant's intent when he did so. The prosecutor then argued the means used, the manner in which the victim was killed, the

---

**5** As with his first forfeited instructional error claim, defendant argues his trial counsel rendered constitutionally deficient assistance by also failing to object to these modified instructions. For the reasons expressed in footnote 3, we reject this argument as well.

35

surrounding circumstances, and defendant's statements to Katelyn following the murder supplied evidence of malice aforethought, as well as premeditation and deliberation.

Defense counsel began her closing argument by noting the prosecution was required to prove defendant killed his mother and argued the only evidence connecting defendant to the crime was the fact his mother's blood was found on his jacket, which could mean he killed her or could mean he found her body, tried to revive her, and then panicked. Because the latter conclusion was reasonable, defense counsel argued, the jury was required to accept it. Defense counsel then directed the remainder of her argument to the points argued by the prosecutor, i.e., defendant's intent, and argued defendant's mental disorder negated his actual formation of malice, as well as his having premeditated and deliberated the crime. At one point during the argument, while addressing the medical examiner's testimony that the method of attack was "overkill," defense counsel also challenged his estimate the victim was killed sometime between 4:00 p.m. and 6:00 p.m. the day before her body was discovered, which was based in part on the fact she spoke to her son Colin around 4:00 p.m. while making jambalaya and had jambalaya in her stomach contents at the time of the autopsy, which the medical examiner estimated was consumed shortly before her death. Defense counsel posited instead that the victim could have been alive that night, ate the jambalaya the following day around 11:00 a.m., and was murdered sometime after that.

The prosecutor argued during her rebuttal argument that defense counsel's argument was "full of good storytelling" that was not "based on the evidence." Rebutting the suggestion an intruder might have entered the house and killed defendant's mother, the prosecutor pointed out there was no evidence of forced entry into the house, no signs of a struggle, and nothing was missing. With respect to the suggestion perhaps defendant's mother was alive when defendant picked Katelyn up at UOP and drove her to

36

Sacramento and back, defendant was telling the truth when he told Katelyn the next morning that their mother got up early and said she would be spending the rest of the day in bed, and perhaps she was murdered later in the day after getting up while defendant and Katelyn were out of the house to eat some of the jambalaya she made the day before, the prosecutor asked the jury to consider whether that theory was "reasonable." The prosecutor also pointed out the medical examiner's estimate as to time of death was also based on the level of rigor mortis of the body that would not have fully set in by the time the victim's body was discovered had she been killed after 11:00 a.m. that day.

It was at this point the prosecutor made the comments defendant claims amount to prosecutorial misconduct: "Look at the evidence. Look at the evidence. Look at what you have. Because there's always possibilities. We can all sit here and fabricate some sort of possibility as to what happened. Your job is to just concentrate on what you have, and that is that testimony and those photographs. [¶] And the most telling explanation is People's Exhibit Number 5. Blood on his jacket. How do you get blood on your jacket if you don't kill her? You've heard no other explanation in evidence. None. Nobody has got on that witness stand and said anything different to you as to another reasonable explanation." Defense counsel did not object to these comments or request a curative admonition.

Prior to the closing arguments, during the instruction conference, the trial court noted the defense requested CALCRIM No. 355, instructing the jury not to consider the fact defendant did not testify. When defense counsel answered, "Yes," the trial court responded: "Okay." However, that instruction was omitted, apparently unintentionally, from the instructions given to the jury.

**B.**

*Prosecutorial Misconduct*

Defendant argues the prosecutor engaged in reversible misconduct by (1) misstating the law, specifically the rule that "to justify a conviction on circumstantial evidence the facts and circumstances must not only be entirely consistent with the theory of guilt but must be inconsistent with any other reasonable conclusion" (*People v. Towler* (1982) 31 Cal.3d 105, 118); and (2) indirectly commenting on his failure to testify in violation of *Griffin v. California* (1965) 380 U.S. 609 [14 L.Ed.2d 106] (*Griffin*). However, as mentioned, he did not object to the prosecutor's comments or request a curative admonition.

"'As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. [Citation.]' [Citation.]" (*People v. Hill* (1998) 17 Cal.4th 800, 820.) "A defendant will be excused from the necessity of either a timely objection and/or a request for admonition if either would be futile. [Citations.] In addition, failure to request the jury be admonished does not forfeit the issue for appeal if ' "an admonition would not have cured the harm caused by the misconduct." ' [Citation.] Finally, the absence of a request for a curative admonition does not forfeit the issue for appeal if 'the court immediately overrules an objection to alleged prosecutorial misconduct [and as a consequence] the defendant has no opportunity to make such a request.' [Citations.]" (*Id*. at pp. 820-821.)

Defendant attempts to get around the forfeiture by arguing he did object to the prosecutor's comment that defense counsel's argument was "full of good storytelling." However, this objection was phrased simply as, "improper argument," after which a

38

bench conference was held.  The record does not reveal the content of that conference or the ruling on the objection.  Nevertheless, this nonspecific objection to "storytelling" references would not have put the trial court on notice defendant was also objecting to *later comments* purportedly misstating the circumstantial evidence rule and improperly commenting on defendant's failure to testify.  For the same reason, defendant's reliance on the exception to the requirement that a curative admonition be requested where the initial objection is overruled is also misplaced.  Defendant made no timely and specific objection to the comments claimed on appeal to have been improper, nor did the trial court overrule such an objection so as to obviate the further requirement that a curative admonition be requested.

Defendant also argues that because the trial court overruled his objection to the "storytelling" comments, "any further objection to prosecutorial misconduct in a similar vein would have been futile."  While we certainly agree similar objections to similar comments would have been futile, the arguments defendant makes on appeal are very different than the objection made below.  We simply do not know what the trial court would have done had defendant raised below the issues he now raises on appeal.  Finally, defendant relies on the exception for circumstances in which admonition would not have cured the harm caused by the misconduct, arguing the purported *Griffin* error was too "blatant" to have been cured by admonition.  (G*riffin, supra,* 380 U.S. 609.)  We disagree.  The prosecutor's comments, even assuming they improperly drew the jury's attention to defendant's failure to testify, were not remotely similar to the blatant violations that occurred in *People v. Rodgers* (1979) 90 Cal.App.3d 368, 371-372, and *In re Rodriguez* (1981) 119 Cal.App.3d 457, 468, upon which defendant relies.  Defendant's claims of prosecutorial misconduct are therefore forfeited.

Anticipating forfeiture, defendant argues in the alternative his trial counsel provided constitutionally deficient assistance by failing to object and request curative admonitions as to the comments now claimed to have been prosecutorial misconduct. This argument also fails. "'In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was "deficient" because his [or her] "representation fell below an objective standard of reasonableness . . . under prevailing professional norms." [Citations.] Second, he [or she] must also show prejudice flowing from counsel's performance or lack thereof. [Citation.] Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."'" (*In re Harris* (1993) 5 Cal.4th 813, 832-833; accord, *Strickland*, *supra*, 466 U.S. at p. 687.)

Here, even assuming the prosecutor's comments were improper and defense counsel's failure to object and request curative admonitions fell below an objective standard of reasonableness, we conclude there was no prejudice. Generally, prosecutorial misconduct is reversible under the federal Constitution "only if the conduct infects the trial with such '"unfairness as to make the resulting conviction a denial of due process."' [Citation.] By contrast, our state law requires reversal when a prosecutor uses 'deceptive or reprehensible methods to persuade either the court or the jury' [citation] and '"it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct"' [citation]." (*People v. Davis* (2009) 46 Cal.4th 539, 612.) *Griffin* error is reversible unless we can conclude "beyond a reasonable doubt the error did not contribute to the verdict obtained," i.e., the standard of *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705] (*Chapman*); *Griffin, supra,* 380 U.S. 609. (*People v. Mesa* (2006) 144 Cal.App.4th 1000, 1008.) However, because

40

defendant's trial counsel failed to object to the challenged comments, the standard of prejudice is converted to that of *Strickland*, i.e., we may reverse only if there is a "'reasonable probability'" the result of the proceeding would have been different had counsel objected. (*Id.* at pp. 1008-1009; see *People v. Ledesma* (1987) 43 Cal.3d 171, 208-209; *People v. Lucero* (1988) 44 Cal.3d 1006, 1032, fn. 6; *In re Avena* (1996) 12 Cal.4th 694, 721-722; see also *Kimmelman v. Morrison* (1986) 477 U.S. 365, 382-383 & fn. 7 [91 L.Ed.2d 305].)

We conclude there is no such probability. The challenged comments related solely to whether or not defendant was the killer. While circumstantial in nature, the evidence that defendant stabbed his mother to death, including the blood on his jacket, the absence of any evidence of forced entry into the house, the fact defendant was the only other person home that weekend, the medical examiner's estimated time of death being between 4:00 p.m. and 6:00 p.m., which coincided with defendant's strange phone calls to Katelyn and his agreement to pick her up at UOP, followed by his concerted efforts to keep her from discovering the body that night and the following morning, was compelling.

## C.

### *Instructional Error*

For the same reason, we also reject defendant's assertion reversal is required because the trial court failed to instruct the jury no adverse inference may be drawn from his failure to testify. As in *People v. Evans* (1998) 62 Cal.App.4th 186, defendant requested such an instruction below, and it was omitted from the instructions, "[a]pparently through inadvertence." (*Id.* at pp. 188-189.) While this was error under *Carter v. Kentucky* (1981) 450 U.S. 288 [67 L.Ed.2d 241], it was harmless under the *Chapman* standard of assessing prejudice. (*Chapman, supra,* 386 U.S. 18.) The only

41

prosecutorial comments arguably drawing the jury's attention to defendant's failure to testify were those relating to whether defendant was the killer. Because, as we have explained, the evidence establishing defendant's identification as the killer was compelling, we also conclude the error was harmless beyond a reasonable doubt.

## VI

### *Cumulative Prejudice*

Finally, we reject defendant's assertion cumulative prejudice flowing from the foregoing assertions of error requires reversal. Each of the errors noted above was manifestly harmless. We cannot conclude the cumulative effect of these errors requires reversal.

## DISPOSITION

The judgment is affirmed.

/s/

HOCH, J.

We concur:

/s/

ROBIE, Acting P. J.

/s/

MAURO, J.

42