Filed 9/22/21  P. v. Ostertag CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>TYLER JAMES OSTERTAG,<br><br>    Defendant and Appellant. | 2d Crim. No. B297690<br>(Super. Ct. No. 2015027858)<br>(Ventura County) |

Tyler James Ostertag appeals a judgment following conviction of second degree murder and dissuasion of a witness, with findings that he personally used a deadly weapon during commission of the murder, suffered two prior serious felony strike convictions, and served a prior prison term.  (Pen. Code, §§ 187, subd. (a), 189, subd. (b), 136.1, subd. (b)(1), 12022, subd. (b)(1), 667, subds. (c)(2), (e)(2), 1170.12, subds. (a)(2), (c)(2), 667.5, subd. (b).)[1]  We modify the judgment to strike the one-year prison term imposed for a prior prison term served, award Ostertag an

---

[1] All further statutory references are to the Penal Code.

additional one day of presentence custody credit, and order that any fines, fees, or assessments be stayed pursuant to the trial court's oral order, but otherwise affirm.

*FACTUAL AND PROCEDURAL HISTORY*

Joseph H. and Daniel M. were attending high school together and were friends. Ostertag, then 20 years old, had attended the same high school. Although Joseph H. and Daniel M. barely knew Ostertag, he "had a problem" with them, based upon complaints of abuse made by Joseph H.'s erstwhile girlfriend. In the spring of 2015, Joseph H. and Daniel M. were having lunch together when Ostertag glared at them from across the street. Daniel M. approached Ostertag and asked if he had a problem; Ostertag replied no and walked away. Later Ostertag returned and resumed staring at Joseph H.

In early August 2015, Joseph H. and Ostertag spoke of fighting each other. Joseph H.'s girlfriend informed him that Ostertag was looking for him.

On August 31, 2015, Daniel M. met some friends at a fast-food restaurant for lunch. They discussed plans to attend an upcoming football game in which Daniel M. would be playing.

Ostertag and about eight others soon arrived in two vehicles at the restaurant parking lot to transact marijuana sales. When Daniel M. saw Ostertag and the others arrive, he placed several phone calls, including to Joseph H., requesting "backup" and referring to Ostertag. Daniel M. stated that "[t]here's some fools here" and that Ostertag was "dogging" him.

Joseph H. arrived in his truck and Daniel M. walked outside to meet him. The two men climbed into the truck bed. Joseph H. and Ostertag glared at each other and Joseph H. shouted, "What's up?" Ostertag walked over to the truck bed and

asked if there was a problem. Joseph H. said no and jumped from the truck bed. Ostertag then charged and punched Joseph H. The two men began to fight in the parking lot, surrounded by onlookers. For several minutes, Joseph H. repeatedly threw Ostertag to the ground and then pronounced that the fight was over. Joseph H. warned Ostertag to stay away.

Ostertag rose from the ground and announced that he was "gonna go get [his] knife" and was "going to stab" and "kill" Joseph H. Daniel M. said in feigned disbelief, "Oh, you're gonna grab a knife." Ostertag responded with obscenities.

Ostertag ran to the vehicle in which he had arrived and took a knife with a four-inch blade. Onlookers shouted warnings that Ostertag had a knife and advised Ostertag to stop. Ostertag did not react to the warnings.

Daniel M. then obtained a metal bar from Joseph H.'s truck. He squared up with Ostertag, asking if Ostertag really intended to stab him. Ostertag and Daniel M. exchanged punches and Ostertag then stabbed Daniel M. in the chest under his left arm. The fight continued for another five seconds as Daniel M. attempted to strike Ostertag with the metal bar. Ostertag then ran to the vehicle belonging to his friend, Blake W. An adult restaurant patron filmed the altercation between Daniel M. and Ostertag, the stabbing, and Ostertag's flight afterward in Blake W.'s vehicle. The patron informed Ostertag and Blake W. that he had filmed the altercation, including Blake W.'s license plate. The prosecutor played the video recording at trial.

Joseph H. drove Daniel M. to the hospital. While Joseph H. was there, Ostertag telephoned him three times and warned him not to tell anyone about the stabbing. He also stated that he

3

would return "with a strap," which Joseph H. understood to be a firearm.

Daniel M. died at the hospital from a stab wound to the heart.  The wound, two and one-half inches deep, caused Daniel M. to bleed to death.

Blake W. drove Ostertag away from the scene.  Ostertag asked Blake W. to drive him to Riverside, and he telephoned a friend to say he was on his way.  As the vehicle passed over a bridge, Ostertag poured water over the knife and threw it in some heavy brush.  He also telephoned another friend and asked for the telephone numbers of Joseph H. and Daniel M.  Ostertag admitted that he stabbed Daniel M. and stated that he hoped Daniel M. would die because he would probably go to jail anyway.

During the drive to Riverside, Ostertag warned Blake W. not to tell anyone about the stabbing because snitches get hurt.  He added that Blake W. should tell police officers that he drove Ostertag to the bus terminal in Los Angeles.  Blake W. drove Ostertag to a motel in Riverside where, at Blake W.'s suggestion, Ostertag turned off his cellular telephone to avoid tracking.

Police officers later arrested Ostertag at the Riverside motel.  Blood on his shirt matched Daniel M.'s DNA profile.  Blake W. led police investigators to the bridge where Ostertag tossed the knife.  They recovered the knife which also contained Daniel M.'s DNA profile.

Ostertag's mother testified that he suffered from longtime mental problems, manifested by poor critical thinking skills, aggressive behavior, and fighting.  He was prescribed antipsychotic medication but refused it and used marijuana instead.  Ostertag had received inpatient and outpatient mental health treatment.  His mother stated that he had threatened her

4

on several occasions and displayed unpredictable and threatening behavior.

Psychologist Christopher Cornell treated Ostertag for two and one-half years and opined that he suffered from bipolar disorder, oppositional defiance disorder, and cannabis abuse. Cornell opined that Ostertag could act impulsively and suddenly without considering the consequences of his actions.

Psychologist Ines Monguio testified that Ostertag's bipolar disorder and brain deficits impaired his decision making, precluding his abilities to think or plan. Monguio opined that Ostertag could not modulate his emotions and that he responded reactively without thought.

The jury convicted Ostertag of second degree murder and dissuasion of a witness (Joseph H.). (§§ 187, subd. (a), 189, subd. (b), 136.1, subd. (b)(1).) It also found that he personally used a deadly weapon during commission of the murder. (§ 12022, subd. (b)(1).) In a separate proceeding, the trial court found that Ostertag suffered two prior serious felony strike convictions and served two prior prison terms. (§§ 667, subds. (c)(2), (e)(2), 1170.12, subds. (a)(2), (c)(2), 667.5, subd. (b).) The court sentenced Ostertag, a third strike offender, to an indeterminate prison term of 70 years to life, plus a determinate two-year term. The court found that Ostertag did not have the financial ability to pay fines and fees, ordered victim restitution, and awarded him 1,347 days of presentence custody credit.

Ostertag appeals and contends that the trial court erred by: 1) not conducting a further inquiry into juror misconduct; 2) not instructing regarding involuntary manslaughter; 3) not instructing regarding his mental impairment relating to

5

consciousness of guilt behavior; and 4) committing several sentencing errors.

*DISCUSSION*

*I.*

Ostertag argues that the trial court erred by not conducting further inquiry into the asserted misconduct by Alternative Juror No. One (Alternative Juror) and two other jurors. He asserts that they discussed and prejudged the case during the defense summation in addition to disobeying the court's many instructions throughout trial not to discuss the case before it was submitted to them. (*People v. Hem* (2019) 31 Cal.App.5th 218, 226, 229 [trial court erred by not conducting any investigation of four jurors discussing case in hallway].) Ostertag argues that the court should have interviewed the three jurors and that this failure has resulted in an incomplete record. He contends that the error is structural, violating his constitutional rights to an impartial jury and to due process of law pursuant to the federal and California constitutions.

On the morning of the first day of jury deliberations, defense counsel notified the trial court that she had received an e-mail from Michael Booser, indicating that on the prior day, he saw Alternate Juror speaking "indignant[ly]" with two other female jurors in the hallway, stating, "You could decide this case in two hours . . . But you could."

The trial court then conducted an examination of Booser, a retired attorney. Booser stated that he was a longtime friend of the Ostertag family, had followed the prosecution, and had attended some days of the trial, including voir dire. He added that he would not have selected the Alternate Juror because she had been the foreperson in a prior criminal trial that reached a

6

verdict.  Booser did not hear any response from the two female jurors with whom the Alternate Juror spoke; he believed the two jurors either did not listen to or disagreed with the Alternate Juror.

Defense counsel requested that the trial court interview the Alternate Juror.  The court declined, reasoning in part that it had just recently instructed (post hallway incident) with CALCRIM No. 3550, regarding the manner of deliberations.  The judge stated: "I gave them the law and how to go about beginning their deliberations apparently immediately after this incident took place."  The court then noted that if further inquiry was demonstrated, it would conduct one.  Ostertag did not request further inquiry.

Subsequently, the Alternate Juror did not participate in jury deliberations.  The deliberations consumed two days; the jury acquitted Ostertag of first degree murder but convicted him of second degree murder and dissuading a witness.

The trial court is obliged to conduct a reasonable inquiry regarding possible juror misconduct to determine if the juror should be discharged and whether the impartiality of other jurors has been affected.  (*People v. Fuiava* (2012) 53 Cal.4th 622, 702.) The nature and extent of the inquiry is within the court's discretion.  (*Ibid.*)  " 'The specific procedures to follow in investigating an allegation of juror misconduct are generally a matter for the trial court's discretion.' " (*People v. Johnsen* (2021) 10 Cal.5th 1116, 1170.)

The trial court acted within its discretion by declining further inquiry.  The evidence reflects that the Alternate Juror made an ambiguous remark that was disregarded or not responded to verbally by the two jurors.  Booser testified that the

7

two jurors appeared to disagree with or ignored the Alternate Juror's statement and he did not hear them speak. Following the hallway incident (unknown at the time to the court), the court instructed with CALRIM No. 3550, concerning the manner of deliberations. The Alternate Juror did not serve on the jury and the deliberations consumed two days of time. There is no substantial likelihood of juror bias and Ostertag suffered no prejudice from the asserted misconduct. (*People v. Johnsen, supra,* 10 Cal.5th 1116, 1171.)

*II.*

Ostertag argues that the trial court prejudicially erred by refusing his request for an instruction regarding involuntary manslaughter and criminal negligence, citing *People v. Brothers* (2015) 236 Cal.App.4th 24, 33-35 [a defendant may be guilty of involuntary manslaughter when he kills without malice during an inherently dangerous assaultive felony].) He relies upon the evidence of his mental impairment, "acting without thinking" when threatened, to show that he acted without either express or implied malice. Ostertag contends that the error denies him due process of law pursuant to the federal and California Constitutions.

The trial court is obligated to instruct on all general principles of law relevant to the issues raised by the evidence regardless of a defendant's formal request. (*People v. Souza* (2012) 54 Cal.4th 90, 115.) This includes instructions on lesser-included offenses if there is evidence that would absolve the defendant of guilt of the greater offense but not the lesser. (*Id.* at p. 116.) However, "the existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the

8

defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury.  [Citations.] 'Substantial evidence' in this context is ' "evidence from which a jury composed of reasonable [persons] could . . . conclude[]" ' that the lesser offense, but not the greater, was committed."  (*People v. Breverman* (1998) 19 Cal.4th 142, 162.)  Whether a reasonable jury could have so concluded based upon the evidence in this case is a matter we determine de novo.  (*People v. Cole* (2004) 33 Cal.4th 1158, 1206, 1215.)

　　*People v. Brothers*, *supra*, 236 Cal.App.4th 24, 34, discussed the crime of a third type of involuntary manslaughter and held: "[A]n instruction on involuntary manslaughter as a lesser included offense must be given when a rational jury could entertain a reasonable doubt that an unlawful killing was accomplished with implied malice during the course of an inherently dangerous assaultive felony."  Malice is implied when an unlawful killing results from a willful act, the natural and probable consequences of which are dangerous to human life, performed with conscious disregard for that danger.  (§ 188; *People v. Elmore* (2014) 59 Cal.4th 121, 133.)

　　Here a rational jury could not have had a reasonable doubt that Ostertag acted with implied malice.  After losing the fight with Joseph H., Ostertag walked to the vehicle and obtained a four-inch knife from his backpack.  Determined, he also announced that he would "kill" Joseph H. despite entreaties from onlookers to walk away.  When Daniel M. squared off with Ostertag and the two men threw punches, Ostertag stabbed Daniel M. in the heart, inflicting a stab wound two and one-half inches deep.  During the drive to Riverside, Ostertag stated, "Hopefully [Daniel M. will] die so I go to jail for something that's

worth it."  Expert witness evidence of Ostertag's mental deficits – impulsiveness, inability to plan or think rationally when threatened, reactive rather than thoughtful behavior – was insufficient to warrant the *Brothers* involuntary manslaughter instruction.

*III.*

Ostertag asserts that the trial court committed instructional error by not informing the jury that it could consider his mental impairment in determining whether he displayed behavior reflecting consciousness of guilt.  He did not object to the instructions in the trial court, but contends that the error affects his substantial rights and is reviewable.  Ostertag relies upon *People v. McGehee* (2016) 246 Cal.App.4th 1190, 1194, 1197-1200, and *People v. Wiidanen* (2011) 201 Cal.App.4th 526, 529-530.  He argues that the error denied him due process of law pursuant to the federal and California Constitutions and violated his Sixth Amendment right to compulsory process.

The trial court instructed with CALCRIM No. 3428 that it only could consider Ostertag's mental defect or disorder for the limited purpose of deciding whether at the time of the charged crime he acted with the requisite mental state for the crimes charged.  The court also instructed with consciousness of guilt instructions, CALCRIM Nos. 371 [concealing evidence, discouraging witnesses, creating false evidence] and 372 [flight] as well as the mental states required for each of the charged crimes.  Ostertag did not request that the court modify CALCRIM No. 3428 to allow the jury to consider his mental impairment as bearing upon a reasoned decision to flee or destroy evidence.

10

*People v. McGehee*, *supra*, 246 Cal.App.4th 1190, and *People v. Wiidanen*, *supra*, 201 Cal.App.4th 526, involved instructions that a defendant's knowingly false statements could be evidence of consciousness of guilt. The reviewing courts concluded that if voluntary intoxication or mental impairment prevented the defendant from knowing his statements were false, the statements were not probative of his consciousness of guilt. (*McGehee*, at p. 1205; *Wiidanen*, at p. 533.) The decisions held that it was error to instruct with an unmodified mental impairment instruction. Nevertheless, the error was harmless in each case. (*McGehee*, at pp. 1206-1207; *Wiidanen*, at p. 534.)

Issues of forfeiture or failure to request modification of CALCRIM No. 3428 aside, pursuant to any standard of review, any error is harmless. The only reasonable inference from Ostertag's behavior following the stabbing is that despite any mental impairment he suffered, he made conscious tactical decisions to avoid detection. Immediately following the stabbing, Ostertag fled and instructed Blake W. to drive him to Riverside. Along the way, he telephoned Joseph H. and threatened him to remain silent. Ostertag also attempted to remove blood from the knife and threw it into a brush-filled creek bed. He accepted Blake W.'s suggestion to turn off his cellular telephone to evade detection. Unlike the mental components in *People v. McGehee*, *supra*, 246 Cal.App.4th 1190, 1206, and *People v. Wiidanen*, *supra*, 201 Cal.App.4th 526, 534, Ostertag's actions to evade detection do not have a knowledge mental component. Moreover, Ostertag does not suggest that there are innocent or non-incriminating explanations for his post-stabbing behavior. CALCRIM Nos. 371 and 372 permitted but did not require the

11

jury to draw inferences of consciousness of guilt from this behavior.

*IV.*

*Sentencing Errors*

Ostertag contends that the 2020 amendment to section 667.5, subdivision (b) precludes imposition of the one-year term because the underlying offense for the prison term was not a sexually violent offense.[2] The Attorney General concedes. Ostertag also argues that he is entitled to an additional day of presentence custody credit for a total of 1,348 days and the Attorney General agrees. Accordingly, we strike the one-year prison term imposed pursuant to section 667.5, subdivision (b), and award Ostertag an additional day of presentence custody credit.

Ostertag points out that the trial court found that he did not have the financial ability to pay a restitution fine and, for that reason, stayed the fine, expressly relying upon *People v. Dueñas* (2019) 30 Cal.App.5th 1157. The court did not impose any further fines, fees, or assessments orally, yet the abstract of judgment disagrees. Accordingly, the abstract of judgment must be amended to show that each of the fines, fees, and assessments is stayed pending a later finding that Ostertag has the ability to pay.

*DISPOSITION*

The trial court is directed to amend the abstract of judgment to reflect the striking of the one-year term imposed pursuant to section 667.5, subdivision (b); to award an additional day of custody credit as discussed herein; and to stay the

---

[2] The trial court struck the second prior prison term allegation because the underlying crime is now a misdemeanor.

12

imposition of any fines, fees, or assessments.  The court shall forward the amended abstract to the Department of Corrections and Rehabilitation.  The judgment is otherwise affirmed.

NOT TO BE PUBLISHED.

GILBERT, P. J.

We concur:

YEGAN, J.

TANGEMAN, J.

13

Derek D. Malan, Judge

Superior Court County of Ventura

_____


Stephen M. Vasil, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Xavier Becerra, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Paul M. Roadarmel, Jr., and David F. Glassman, Deputy Attorneys General, for Plaintiff and Respondent.