Filed 3/17/26  P. v. Martinez CA6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>MATTHEW JON MARTINEZ,<br><br>Defendant and Appellant. | F088356<br><br>(Super. Ct. No. BF193778A)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  John W. Lua, Judge.

Benjamin Owens, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Lewis A. Martinez and Amanda D. Cary, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

A jury convicted defendant Matthew Jon Martinez of first degree murder for shooting Anthony Martin over a $5 drug deal. He was sentenced to 50 years to life in prison.

On appeal, Martinez argues the trial court erred when it instructed the jury with CALCRIM Nos. 362 (false statements as evidence of consciousness of guilt), 625 (evidence of voluntary intoxication), and 3428 (evidence of mental impairment as a defense to specific intent or mental state). Martinez contends these instructions, taken together, erroneously limited the jury from considering whether his intoxication and mental impairment prevented him from knowingly making false statements to law enforcement. We reject Martinez's contentions and affirm.

## PROCEDURAL BACKGROUND

On April 3, 2023, the Kern County District Attorney filed an information charging Martinez with first degree murder (Pen. Code, §§ 187, subd. (a), 189; count 1).[1] The information also alleged Martinez personally and intentionally discharged a firearm proximately causing death (§ 12022.53, subd. (d)) and the following aggravating factors: the crime involved great violence (Cal. Rules of Court, rule 4.421(a)(1)),[2] Martinez was armed with a weapon during the commission of the crime (rule 4.421(a)(2)), the victim was particularly vulnerable (rule 4.421(a)(3)), the manner in which the crime was carried out involved planning, sophistication, or professionalism (rule 4.421(a)(8)), and Martinez engaged in violent conduct that indicates a serious danger to society (rule 4.421(b)(1)).

On June 11, 2024, the parties stipulated that Martin suffered the following criminal convictions: felony assault with a knife in 2001; misdemeanor inflicting corporal injury on a significant other or cohabitant in 2021; and misdemeanor battery on a significant other or cohabitant in 2021.

---

[1]     Undesignated statutory references are to the Penal Code.

[2]     Undesignated rule references are to the California Rules of Court.

On June 18, 2024, a jury found Martinez guilty of first degree murder (§ 187, subd. (a)), and found the firearm enhancement true (§ 12022.53, subd. (d)).

In a bifurcated court trial, the trial court found two aggravating factors true, Martinez was armed with a weapon during the commission of the crime (rule 4.421(a)(2)) and he engaged in violent conduct that indicates a serious danger to society (rule 4.421(b)(1)).[3] The other three aggravating factors the court found not true (rule 4.421(a)(1), (a)(3), and (a)(8)).

The trial court sentenced Martinez to a term of 50 years to life in prison as follows: on count 1, 25 years to life, plus 25 years to life for the related firearm enhancement.

## FACTUAL BACKGROUND

### I. The Prosecution's Case

### A. The Shooting and Investigation

On February 23, 2023, at approximately 6:30 p.m., the Bakersfield Police Department received a call that an individual had been shot in the parking lot of a business complex on Stockdale Highway. When officers Joshua Ince and Helmuth Achtmann arrived to the scene, they found Martin lying on his back on the ground with a gunshot wound to his abdomen. Martin told Ince an individual named "Matt" shot him; the individual was in his 20's to 30's and riding on a bicycle. Ince rendered medical assistance to Martin until the ambulance arrived, about five minutes later. Achtmann interviewed the reporting party and searched for the suspect who matched the description Martin provided, and other witnesses. He found no one on a bicycle.

---

[3] The parties stipulated to a bifurcated trial on the aggravating factors. Martinez waived his right to a trial by jury.

Detective Danni Melendez, the lead detective in the case, and other officers searched the crime scene for evidence. Hardly any blood and no shell casings were found at the scene. Melendez also reviewed body-worn camera footage from responding officers as well as video surveillance footage of the crime scene and surrounding area. The body-worn camera footage showed Martin's dog tied to a nearby fence. Surveillance video footage showed Martin with his dog "hanging out" in the parking lot of a pizza parlor pushing a shopping cart. The shooting occurred at the gas station east of the pizza parlor. The video also showed a male with a chrome bicycle talking to a gas station employee and purchasing a "Four Lokos" alcoholic beverage. The cyclist wore gloves and carried gold foil wrapping paper while in the gas station.

Detectives interviewed the gas station employee. He identified the male with the chrome bicycle as "Matt" or "Matthew." The employee recognized Martinez because he was a "regular" at the station and the employee's neighbor. Martinez had a "scar" on his forehead and often purchased "green Four Lokos." The employee provided law enforcement with a description of where Martinez lived.

Melendez and his partner drove to the area where Martinez lived. In an alley near Martinez's apartment, Melendez noticed "chrome or silver over-spray" from a paint canister on the bushes, an aerosol spray can, and an empty "Four Lokos" can. A records check revealed previous calls for service involving Martinez and old body camera footage, which showed an individual resembling Martinez leaving the apartment where the gas station employee said he lived.

Detectives obtained a search warrant and searched Martinez's apartment. They found a "chrome or silver" bicycle. Officers also found silver paint cans, mechanic-style gloves, a black beanie, gold wrapping paper, blue pants, additional black gloves, a cell phone, and Martinez's California ID during the search.

Officers spoke with Martinez's neighbor, M.G. He lived next to Martinez for over 10 years. The pair were close and saw each other almost daily. M.G. described his

4.

relationship with Martinez as "almost like a brother." In February 2023, Martinez brought to M.G.'s apartment a "long gun," a "handgun," and ammunition, and told M.G. to hide the guns and ammunition.[4] The next day, Martinez told M.G. he had "shot somebody." Officers recovered a 12-gauge shotgun, .22-caliber revolver, and ammunition for both guns after M.G. showed them where the guns were hidden. A single bullet had been shot from the .22-caliber revolver.

## B. Martin's Autopsy

On March 17, 2023, Dr. Robert Whitmore, a forensic pathologist, performed an autopsy on Martin. Martin suffered a single penetrating gunshot wound to his abdomen, which bullet lodged in his spinal canal after passing through both sides of Martin's aorta and caused his death on February 23. A single bullet with a caliber less than .30-caliber was found in Martin's body. There was no other trauma to Martin's body. Martin had fentanyl and methamphetamine in his blood when he died.

## C. Martinez's Interview with Law Enforcement

On March 1, 2023, about one week after the shooting, Melendez interviewed Martinez at the police department.[5] Martinez agreed to talk to Melendez and waived his rights pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436. Martinez initially told Melendez he could not remember what he did on February 23, 2023. Martinez then said he walked to a gas station at about 4:00 p.m. Although Martinez admitted he had a bicycle, he said he did not use it because it was not "put together yet." After seeing the surveillance video of himself with a bicycle in the gas station parking lot, Martinez next said he borrowed the bicycle from his "homeless" friend.

When Martinez was shown a photo of Martin, he first said he did not know if he had ever seen or met Martin before. He then said he had seen Martin "pushing a basket"

---

[4]     The "handgun" was a revolver, and the "long gun" was a "shotgun."

[5]     A video recording of Martinez's interview with Melendez was played for the jury.

and only stopped to talk to Martin as shown on the surveillance video to buy drugs. After talking with Martin, he got a pizza and went home. Martinez denied killing Martin. He did not remember "doing that"; he had been "drinking that day." Martinez also said he did not have or own a gun.

Martinez eventually admitted to shooting Martin but his account of the shooting varied. First, Martinez said Martin was killed because earlier in the day Martin had threatened to stab Martinez when Martin next saw him. Martin wanted to fight Martinez and socked Martinez in the head before starting to reach for a knife. Martin threatened Martinez with a knife, so Martinez shot him "[o]nce." Martinez admitted making this "mistake" but said that Martin should never have threatened him. Martinez later admitted that he never saw Martin with a knife but said that Martin "was going for something."

Next, Martinez explained that he went to the pizza parlor and encountered Martin. Martinez was familiar with Martin because he had purchased drugs from him "two or three times." He asked Martin for drugs, but Martin told him " '[n]o.' " Martinez left, and when he returned, Martin still would not give Martinez drugs. Then, Martin "socked" him. Martinez later conceded that Martin never put hands on him..

Initially claiming he did not "remember," Martinez then said he gave Martin "five bucks" for methamphetamine. But Martin wanted to fight, Martinez got scared, so Martinez shot him. Martinez carried a loaded .22-caliber "handgun" the night of the shooting. Martinez feared Martin because Martin was on "fentanyl." Martinez was not himself on drugs that day but only had a "couple drinks of beer."

Martinez next claimed he went to the gas station to buy beer, "Coors Light" and "Four Loko." He encountered Martin outside the gas station where Martin offered to sell Martinez drugs. Martinez purchased a "nickel bag" from Martin for $5. Martin had a "look in his eye" that scared Martinez and thus, he decided to shoot Martin. Martin never touched Martinez prior to the shooting, but Martinez had "seen [Martin] fight before."

6.

That prior fist fight resulted in Martin's opponent "molly walking" or badly beating Martin.

Martinez took the gun when meeting Martin because he thought Martin would fight and stab him. Then, Martinez said he took the gun to purchase drugs from Martin because he thought Martin was going to steal from him. Martin had stolen Martinez's bicycle and money in the past. Martinez said he "panicked" and shot Martin.

When Martinez returned home, he told his wife he got scared and "shot someone." The next day, he took his two guns and ammunition to M.G.'s house and asked M.G. to hold them. Martinez took the guns to M.G. "because [he] was going to get in trouble" "[b]ecause [he] shot someone."

He did not intend to kill Martin. He only tried to shoot Martin in the leg so that Martinez could get away from Martin. About three days after the shooting, when he heard that Martin died, Martinez got scared. Although Martinez had a mustache on the night of the shooting, he denied shaving it off after the shooting to change his appearance.

## II.     The Defense's Case

### A. Expert Testimony

#### 1. Dr. Hutchison

Dr. Harrol Hutchison, a neurologist, treated Martinez in 2000 at Valley Children's Hospital. Martinez suffered a severe traumatic brain injury and underwent a craniotomy to drain fluid. When Martinez was admitted to the hospital rehabilitation center on July 21, 2000, he had a scar on his scalp, was a "bit confused," and used a wheelchair. While at the rehabilitation center, Martinez underwent physical therapy, occupational therapy, speech therapy, recreational therapy, neuropsychology evaluations, and audiology evaluations. Martinez was discharged in October 2000.

When Martinez started treatment, he needed a wheelchair to walk, his speech was disconnected, he was apathetic, and he had problems with short-term memory. Eight months after the injury Martinez "improved considerably." He had some "memory

7.

issues." However, Martinez had "temper outbursts" prior to sustaining the traumatic brain injury.

Hutchison testified a severe traumatic brain injury is a "lifelong condition." The more time that passes after a brain injury, the more difficult it becomes to associate a particular behavior to the brain injury. The long-term consequences of a traumatic brain injury include problems with memory, orientation, judgment, control, concentration, motivation, and socialization. Hutchison had not seen or spoken to Martinez since 2001. Hutchison had no idea how the long-term consequences affected Martinez more than 20 years later.

### 2. Dr. Musacco

Dr. Michael Musacco, a psychologist, testified about his assessment of Martinez. As part of his assessment, he interviewed Martinez and reviewed his medical records, the police report, the video recording of Martinez's interview with law enforcement, jail mental health records from 2019 and following his arrest in this case, and Martinez's records from Valley Children's Hospital. Musacco interviewed Martinez in October 2023. During the interview, Martinez was subdued. He had low energy, slow mental processes and speech. Martinez struggled to respond to Musacco's questions in a cogent and organized way.

Martinez also underwent psychological testing. Martinez received an IQ score of 78. Thus, he was diagnosed with borderline intellectual functioning, which is a condition when a person possesses near significant deficits in their intelligence. An individual with an IQ below 70 has a "mild intellectual disability." The average IQ score is from 85 to 115. The "M-FAST" test indicated Martinez was not malingering; he was not faking or exaggerating symptoms of psychosis.

Musacco diagnosed Martinez with a neurocognitive disorder. He based this conclusion on Martinez having suffered from a traumatic brain injury due to a serious moped injury in July 2000. As a result, he had multiple fractures of his skull and his face.

Martinez was in special education classes and experienced a "learning disability" prior to the brain injury. However, after the injury Martinez exhibited an increase in anger and a decrease in impulse control. At the time he was evaluated, Martinez was able to read and comprehend at a fourth grade level. The brain injury may have lowered Martinez's IQ, but Musacco could not opine to what extent it impacted his intellectual functioning.

Finally, Martinez was diagnosed with a substance abuse disorder. He had an addiction to multiple substances, including marijuana, alcohol, and methamphetamine. Martinez had been addicted to drugs his entire adulthood. His drug use disorder has had the "biggest impact" on his life. However, Martinez's borderline intellectual functioning and head injury were also problematic. According to Musacco, Martinez's diagnosed conditions existed at the time of the shooting in this case. An individual with Martinez's conditions may exhibit more rash decisionmaking and impulsivity.

On cross-examination, Musacco opined that an individual facing Martinez's diagnoses can think rationally. He also noted that during the interview with law enforcement, Martinez did not exhibit the symptoms of an individual who is under the influence of methamphetamine. Musacco acknowledged Martinez's "evolving version" of events that occurred on the night of the shooting was indicative of an individual coming to "realize they are in big trouble." It is "human nature" rather than the effects of drug use to initially deny culpability and then eventually tell the truth once the individual realizes the extent of the evidence against them.

## B. Martinez's Testimony

Martinez testified on his own behalf at trial. He described himself as a "fair student" who had "outbursts." When he was about 15 years old, he suffered an injury and was taken to Valley Children's Hospital. He was placed in "special education" classes when he returned to school after his hospital stay, and "continued to struggle." He went to the 12th grade of high school but did not graduate. Martinez did not suffer from "memory issues" after he left the hospital.

Martinez started drinking alcohol when he was about 10 years old. He drank "very heavily" up to the day of the shooting. Martinez began smoking marijuana when he was about 13 years old, which turned into an "everyday habit." Martinez started using methamphetamine after he suffered the traumatic brain injury. He used methamphetamine about three times a week as a teenager. In February 2023, Martinez was "[h]eavily" using methamphetamine. He did not have a particular drug dealer, he obtained drugs by asking around.

In February 2023, Martinez lived in an apartment near Stockdale Highway. He typically rode his bicycle wherever he needed to go. He drank alcohol, smoked marijuana, and used methamphetamine daily. Martinez had been a drug addict for 23 years. Martinez did not work; his main income was Social Security, but he also gardened as a side job.

Martinez first met Martin about two years before the shooting when they were "smoking spice" together. He saw Martin only about five times thereafter. Martin previously stole Martinez's bicycle and money. About six months after Martin robbed him, Martinez saw Martin pull a man out of a truck and "beat[] him up" in a parking lot.

Martinez admitted that, even though he remembered what occurred the night of the shooting, he did not tell the truth when he was interviewed by law enforcement. He testified he was up the whole night prior to February 23, 2023. On the morning of the shooting, Martinez smoked marijuana. Around 10:00 a.m., he walked to the gas station near his apartment to purchase beer and cigarettes. In the middle of the day, Martinez attempted to fix a steam cleaner. He also began drinking and using methamphetamine.

Later that day, Martinez went back to the gas station to buy more cigarettes and alcohol. He rode his chrome bicycle. He was "under the influence" of methamphetamine, alcohol, and marijuana. After leaving the gas station, he rode his bicycle to the area around Stockdale Highway looking for someone who would sell him methamphetamine because he ran out earlier that day.

10.

Martinez saw Martin near a pizza parlor before he went to the gas station. Martin asked Martinez if he was looking for methamphetamine. Martinez told Martin "hold on" because he wanted to buy alcohol at the store inside the gas station first. After leaving the store, he talked to Martin again but did not have $5 to pay Martin for the methamphetamine. Martinez went home to get more money. Martinez had a revolver in his possession. This gun, later found by law enforcement at M.G.'s apartment, belonged to Martinez.

After getting $5, Martinez went back to where he first saw Martin but could not find him. Martinez was told by someone in the area that Martin was by the "FedEx." Martinez was riding his bicycle toward "FedEx" when Martin saw Martinez and called him over. Martin was with a group of about five individuals smoking fentanyl. Martin left the group, tied his dog up, and led Martinez to a dark area of the parking lot.

Martinez gave Martin $5 for methamphetamine. Martinez received a small amount of methamphetamine in a plastic baggie. Martinez asked for his money back because he felt the small quantity of drugs was unfair for the $5 paid. Martin got upset and told Martinez if he wanted the $5 back, Martinez would have to "fight" him for it. Martinez did not want to fight Martin. Martinez kept the methamphetamine and attempted to leave, when Martin threatened to push Martinez off his bicycle and fight him. Martinez "panicked and feared for [his] life .…" Martinez told Martin that he was not going to fight him. Martin asked, "are you [going to] shoot me?" Martinez responded that if Martin would not let him "clear the parking lot" he would shoot him.

Martinez pulled out his gun and pointed it at Martin for approximately one minute before shooting Martin. The gun was fully loaded when Martinez put it in his waistband prior to the shooting. Martinez aimed for Martin's thigh; he did not intend to kill Martin. Martin's hands were up and empty when Martinez fired. Martin was about 25 feet away when Martinez shot him.

11.

Martin he fell to the ground after Martinez shot him. Martinez then got on his bicycle and rode away. Martinez thought Martin was possibly in possession of a knife, however, he did not know for sure and did not see Martin with a knife on the day of the shooting.

Terrified about getting caught, Martinez hid the guns at M.G.'s home. Martinez gave M.G. the gun that he used to kill Martin, plus another gun, and ammunition about two days after the shooting. He gave M.G. the weapons because he feared law enforcement might search Martinez's apartment.

Although during the initial interview with law enforcement he was dishonest, Martinez testified that he answered some questions honestly. Martinez denied trying to change the color of his bicycle or appearance to avoid detection. Martinez used the chrome spray paint to paint his bicycle rims before the shooting. He accidentally trimmed his mustache too high and ended up cutting it off. Martinez did not plan to shoot Martin; he shot him because he was threatened and wanted his money back from the transaction over methamphetamine.

On cross-examination, Martinez admitted he told law enforcement a different story than what he testified to at trial. He lied to "protect himself." Martinez intentionally shot Martin with a .22-caliber revolver. To fire the gun that killed Martin, Martinez had to engage in a two-step process, pull the hammer back and pull the trigger. Martinez contemplated as to whether he was going to shoot before he shot Martin.

Martin was "homeless" and unarmed on the night he was shot. Martin did not threaten Martinez with a weapon during the encounter that led to the shooting, nor did he "run" towards Martinez. Martinez knows that shooting a gun at someone is extremely dangerous that can lead to death.

## DISCUSSION

Martinez argues his conviction should be reversed because the trial court violated his federal constitutional right to due process by instructing the jury on false or misleading statements as evidence of consciousness of guilt, while also instructing the jury that his voluntary intoxication and mental impairment could not be considered in determining whether he knowingly made the false statements.

The People respond Martinez's instructional challenge has been forfeited because he did not object and he did not raise any of the arguments at trial that he presents here on appeal with respect to these instructions.

We conclude that even assuming instructional error in providing CALCRIM Nos. 362, 625, and 3428, such errors were neither prejudicial nor constituted a due process violation under federal law.

### I.     Jury Instructions

Following a discussion regarding jury instructions off the record, the parties discussed the instructions that required editing or redacting, including CALCRIM No. 3428, regarding evidence of mental impairment.  The trial court noted it redacted the instruction and sent it to counsel for review.  The parties agreed with the final wording of CALCRIM No. 3428.

The trial court instructed the jury with CALCRIM No. 362 on consciousness of guilt arising from a criminal defendant making knowingly false statements:

> "If the defendant made a false or misleading statement before this trial relating to the charged crime, knowing the statement was false or intending to mislead, that conduct may show he was aware of his guilt of the crime and you may consider it in determining his guilt.

> "If you conclude that the defendant made the statement, it is up to you to decide its meaning and importance.  However, evidence that the defendant made such a statement cannot prove guilt by itself."

13.

The trial court also instructed the jury with CALCRIM No. 625:

"You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted with an intent to kill, and whether the defendant acted with deliberation and premeditation.

"A person is voluntarily intoxicated if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect.

"You may not consider evidence of the defendant's voluntary intoxication for any other purpose."

Finally, the jury was instructed with CALCRIM No. 3428, regarding mental illness as a defense to specific intent or mental state:

"You have heard evidence that the defendant may have suffered from a mental disorder. You may consider this evidence only for the limited purpose of deciding whether, at the time of the charged crime, the defendant acted with the intent or mental state required for that crime.

"The People have the burden of proving beyond a reasonable doubt that the defendant acted with the required intent or mental state. The required intent or mental state for each crime is explained in the instructions for each crime. If the People have not met this burden, you must find the defendant not guilty of the associated crime."

Defense counsel did not object to these instructions.[6]

Relying on *People v. McGehee* (2016) 246 Cal.App.4th 1190 (*McGehee*) and *People v. Wiidanen* (2011) 201 Cal.App.4th 526 (*Wiidanen*), Martinez maintains the jury was prohibited from considering how his false statements during his interview with law enforcement may have been impacted by his intoxication and/or mental impairment. He

___

[6] Martinez's position is that the challenged instructions affected his substantial rights and violated his right to due process. Thus, defense counsel did not have to raise the argument at trial. (*People v. Franco* (2009) 180 Cal.App.4th 713, 719 [if the instructional error affected the defendant's substantial rights the forfeiture rule does not apply]; see also *People v. Smithey* (1999) 20 Cal.4th 936, 976, fn. 7; § 1259.) We therefore review the merits of Martinez's claims.

argues the instructions, taken together, prohibited the jury from considering his intoxication and/or mental impairment for any other purpose than whether he had the requisite specific intent for count 1 and, therefore, his false statements might not have been probative of a consciousness of guilt. Martinez asserts this was also state law instructional error.

The People maintain the court's conclusions in *McGehee* and *Wiidanen* were flawed and there was no instructional error. Finally, any instructional error was not prejudicial and did not constitute a violation of federal due process.

## A. Standard of Review

A reviewing court independently considers whether a jury instruction correctly states the law. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) Our task is to review the instructions given as a whole and the entire trial record to determine "whether the jury was 'reasonably likely' to have construed them in a manner that violates the defendant's rights." (*People v. Rogers* (2006) 39 Cal.4th 826, 873.) The correctness of the jury instructions " ' "is to be determined from the entire charge of the [trial] court, not from a consideration of parts of an instruction or from a particular instruction." ' " (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1248.) " 'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' " (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)

## B. *Wiidanen* and *McGehee* Decisions

Martinez argues the trial court erred in instructing the jury with CALCRIM No. 362, in combination with CALCRIM Nos. 625 and 3428. The Third District Court of Appeal considered jury instructions on consciousness of guilt (CALCRIM No. 362) given in combination with an instruction on voluntary intoxication (CALCRIM No. 3426) (*Wiidanen*, *supra*, 201 Cal.App.4th at p. 533) and mental impairment (CALCRIM No. 3428) (*McGehee*, *supra*, 246 Cal.App.4th at pp. 1203–1204).

15.

In *Wiidanen*, the defendant was accused of orally copulating another man at a party involving a lot of drinking, who was sleeping at the time. (*Wiidanen*, *supra*, 201 Cal.App.4th at p. 528.) The defendant was still intoxicated the next day when he was interviewed by police. (*Id*. at p. 529.) The defendant gave false statements to police about what had occurred; the defendant denied he had been at the party when the crime took place and further denied he engaged in the alleged conduct. (*Id*. at pp. 528–530.) However, DNA swabs taken from the victim's body and the defendant's mouth proved that his statements were false. (*Id*. at p. 530.)

In *McGehee*, the defendant, who was mentally disturbed, stabbed his mother multiple times with a kitchen knife, killing her. (*McGehee*, *supra*, 246 Cal.App.4th at pp. 1194, 1197, 1201.) Although the defendant knew his mother was dead, when his sister returned home to stay with their mother, the defendant falsely told her a variety of stories throughout the day regarding why their mother was absent and unable to come out of her room. (*Id*. at pp. 1197–1199.)

The trial courts instructed on consciousness of guilt based on false statements made before trial, CALCRIM No. 362, and instructed on voluntary intoxication, CALCRIM No. 3426[7] (*Wiidanen*), and mental illness/impairment, CALCRIM No. 3428 (*McGehee*). In *Wiidanen*, *supra*, 201 Cal.App.4th 526, the appellate court held that the combination of both CALCRIM No. 362 (consciousness of guilt) and CALCRIM No. 3426 (voluntary intoxication) erroneously limited the jury from considering whether the defendant's intoxication prevented him from knowing his statements were false or misleading. (*Wiidanen*, at pp. 532–533.) The court found this prohibition was error

---

[7] We note CALCRIM No. 625 was provided in this case. The instruction does not differ substantially from CALCRIM No. 3426. Fundamentally, both instructions provide that the jury may only consider evidence of the defendant's voluntary intoxication in deciding whether the defendant acted with the specific mental state for the charged crime (i.e., intent to kill or deliberation and premeditation). Both instructions derive from section 29.4.

16.

because the defendant's false or misleading statements made when he was intoxicated may not be probative of his consciousness of guilt, if the jury believed the defendant was too intoxicated to know his statements were false or misleading. (*Id*. at p. 533.) Following *Wiidanen*, the same appellate court found similar error in providing a version of CALCRIM No. 3428 (mental illness) with CALCRIM No. 362. (*McGehee*, *supra*, 246 Cal.App.4th at pp. 1204–1205.)

In each case, the appellate court concluded it was error to give the instructions that effectively precluded the jury from considering the defendant's intoxication or mental illness as to consciousness of guilt. (*Wiidanen*, *supra*, 201 Cal.App.4th at p. 533; *McGehee*, *supra*, 246 Cal.App.4th at pp. 1204–1205.) But, the court found the state law instructional error was neither prejudicial nor violative of federal due process. Noting that conflicting instructions can create an "irrational permissive inference" that violates due process, the court ruled "[a] permissive inference violates the Due Process Clause only if the suggested conclusion is not one that reason and common sense justify *in light of the proven facts before the jury*." (*Francis v. Franklin* (1985) 471 U.S. 307, 314–315, italics added; *Wiidanen*, at p. 533; *McGehee*, at pp. 1204–1205.)

There was no due process violation in these cases because the " 'suggested conclusion' "—that the defendant was aware of his guilt when he made the false statements—was reasonable in light of the proven facts before the jury. (*Wiidanen*, at p. 534.) It was not reasonable that the defendant in *Wiidanen* gave false statements due to intoxication because he selectively recalled events from the party during his interview with law enforcement. "That [the] defendant had the ability to fake a clear memory about events that exculpated him and to fake a hazy memory about neutral facts suggested defendant knew how to contrive even while allegedly drunk. Therefore, the permissive inference, i.e., [the] defendant was aware of his guilt when he made the false statements, was reasonable, and the court did not violate [the] defendant's due process rights by giving these instructions." (*Ibid*.)

17.

In *McGehee*, the court considered evidence of the defendant's false statements to his sister and his extensive efforts to physically keep her from discovering their mother's body before concluding he would not have engaged in these acts if he actually believed she were alive. (*McGehee*, at p. 1206.) "Thus, the permissive inference that [the] defendant was aware of his guilt when he made the false statements was reasonable, and the trial court did not violate his due process rights by giving the challenged instructions." (*Ibid*.)

## C. Federal Due Process Violation

Martinez argues the trial court made the same instructional error found by the courts in *Wiidanen* and *McGehee*, by limiting the consideration of evidence of voluntary intoxication and/or mental impairment to only the question of whether he had the intent required for the charged crime and not on the issue of consciousness of guilt. However, unlike those cases, Martinez asserts his constitutional right to due process was violated because it deprived him of the right to present a complete defense.[8]

Assuming, without deciding, that instructing the jury on voluntary intoxication (CALCRIM No. 625), mental illness (CALCRIM No. 3428), and consciousness of guilt (CALCRIM No. 362) was a state law instructional error as determined by *Wiidanen* and

---

[8]    The *Wiidanen* and *McGehee* cases found no federal constitutional violation because the facts in those cases could be rationally interpreted to support the suggested inference that the defendants' statements were knowingly false and therefore probative of their consciousness of guilt. (*Wiidanen*, *supra*, 201 Cal.App.4th at p. 533 [to violate due process, the inference must be one that reason and common sense do not justify]; see also *People v. Goldsmith* (2014) 59 Cal.4th 258, 270 ["Permissive inferences violate due process only if the permissive inference is irrational"].) Martinez maintains this is not the constitutional violation he argues here. Still, the evidence jurors received through Martinez's video recorded interview with police, the testimony of the defense expert Dr. Hutchinson, and Martinez's own testimony justify through reason and common sense the conclusion that Martinez knew his statements to police were false when he made them.

*McGehee*, we nonetheless conclude the assumed instructional error was not constitutionally defective.

Martinez cites *Crane v. Kentucky* (1986) 476 U.S. 683 (*Crane*), for the proposition that reliable evidence bearing on the credibility of his confession, which was central to his claim of innocence, was excluded; thus, he was denied of his right to prepare a complete defense. (*Id*. at p. 690.) In *Crane*, after police arrested a 16-year-old boy for his suspected participation in a crime, the boy confessed to a "host of local crimes," including murder. (*Id*. at p. 684.) During trial, the prosecution's case was based upon the defendant's confession to the murder. Defense counsel's theory was that the confession was full of inconsistencies, and the circumstances surrounding the confession were sufficient to cast doubt upon its credibility. (*Id*. at p. 685.) The prosecutor moved in limine to prevent the defense from presenting any testimony about the circumstances in which the defendant's confession was obtained. The trial court granted the prosecutor's motion. (*Id*. at pp. 685–686.)

The United States Supreme Court reversed, finding a distinction between "the voluntariness of a confession and evidence bearing on its credibility." (*Crane*, *supra*, 476 U.S. at p. 687.) The court reasoned that " 'evidence surrounding the making of a confession bears on its credibility' as well as its voluntariness." (*Id*. at p. 688.) The *Crane* court held that the defendant was deprived of a meaningful opportunity to put forth a complete defense by being denied the opportunity to introduce testimony about the circumstances surrounding his confession. (*Id*. at pp. 690–691.)

*Crane* is distinguishable. Martinez was not deprived of the right to present evidence which may have assisted his defense. Evidence of his mental impairment and drug addiction were admitted for the jury to consider through his video recorded interview, expert testimony, and his own testimony. He nonetheless argues that limiting the jury's consideration of that evidence to only the question of whether he had the intent required for murder deprived him of the right to prepare a complete defense. However,

19.

Martinez has not shown or explained how his statements to law enforcement, even if the jury could have considered his mental illness or intoxication as probative of consciousness of guilt, would have impacted the jury's impression of his credibility. (See, e.g., *Crane*, *supra*, 476 U.S. at pp. 690–691.)

Moreover, Martinez does not argue his conviction was based on an unreliable confession. Martinez testified he lied to law enforcement during his initial interview because he was scared and tried to protect himself. He provided an explanation to the jury for his false statements.[9] Martinez also admitted he intentionally shot Martin with a .22-caliber revolver. There is nothing in the record before us which shows Martinez's conviction was based on an unreliable confession or that he was deprived of a meaningful opportunity to present a complete defense. There was no federal due process violation.

**D. Any State Law Instructional Error Was Harmless**

We also conclude any state law instructional error was harmless under *People v. Watson* (1956) 46 Cal.2d 818, 836, that is, it is not reasonably probable that a more favorable result would have been reached if the jury had been permitted to consider Martinez's intoxication and mental impairment with respect to his false statements and his consciousness of guilt.

The jury had already considered Martinez's intoxication and mental impairment but concluded it did not affect his ability to formulate the specific intent to kill, with premeditation and deliberation. Martinez had the opportunity to argue, and did argue, to the jury his intoxication and drug use rendered him confused on the details of the crime during his interview with law enforcement. However, based on the verdict, jurors found otherwise; the facts surrounding Martinez's false statements on which the consciousness

---

[9] Notably, we point out Martinez admitted at trial that he did not tell the truth to law enforcement when he was interviewed, although he remembered what occurred on the night of the shooting.

of guilt inference was grounded indicated he was aware of what had happened, despite any intoxication or impairment.

While there is significant evidence showing Martinez suffered from drug addiction his entire adult life and experienced a traumatic brain injury, Martinez's false statements to law enforcement reasonably indicated his denials were not random, confused words of an individual who was too intoxicated or mentally ill to know or understand their falsity. Martinez did not exhibit symptoms of an individual on drugs during his interview with law enforcement, an interview jurors were able to see as well as hear during the trial. The changing version of events that he told law enforcement regarding the night of the shooting was, as Musacco testified, indicative of an individual coming to "realize they are in big trouble." Martinez's memory of the events of the night of the murder, to which he testified in great detail at trial, did not indicate impairment due to intoxication or mental impairment. He testified that he lied during the interview to protect himself, not because he was too intoxicated or mentally ill to understand or appreciate what he said was false.

Moreover, Martinez's ability to accomplish a variety of specific, purposeful actions during the time before and after the murder does not support the conclusion Martinez was so significantly intoxicated or mentally impaired at the time of the shooting such that he could not clearly remember the events. For example, when he first encountered Martin, he knew he did not have enough money to pay him for methamphetamine and went home to get the requested amount. When asked why he shot Martin, he testified he was "threatened" and the transaction felt "unfair." After the shooting, he gave his guns to M.G. to hide. Martinez told his wife and M.G. that he shot someone.

Most significantly, the evidence supporting the jury's determination that Martinez murdered Martin, with premeditation and deliberation, is overwhelming. Martinez testified he deliberately shot Martin after pulling his gun and considering his actions for

about one minute before pulling the hammer back and pulling the trigger to fire the fatal shot. Surveillance video captured the shooting, showing the sequence of events, the drug transaction, and revealed Martinez's identity. Martin identified Martinez as the shooter. The gun Martinez used to kill Martin was found at M.G.'s residence, matching the testimony of both Martinez and M.G. A single bullet had been shot from Martinez's .22-caliber revolver, which was consistent with the bullet found in Martin's body.

Based on our review of the evidence, we conclude any error was harmless in light of the overwhelming evidence of Martinez's guilt. Moreover, the jury considered Martinez's intoxication and evidence of mental impairment and concluded it did not affect his ability to commit first degree murder. The facts surrounding Martinez's false statements during his interview with law enforcement indicated he was aware of what had happened, despite his intoxication and/or mental impairment, and knew his statements were false at the time he made them.

Thus, even if the jury had been expressly instructed they could consider Martinez's intoxication and/or mental impairment in determining whether his false statements were knowingly made, we conclude there is no reasonable probability of a different result. Since any error is harmless, it could not have affected Martinez's substantial rights. (*People v. Franco*, *supra*, 180 Cal.App.4th at p. 720.)

### E. Martinez Forfeited His Claims

Defense counsel made no objection to the proffered instructions. Because we conclude the alleged instructional errors did not affect Martinez's substantial rights or violate his right to due process, we also conclude his arguments of instructional error were forfeited at trial. (*People v. Anderson* (2007) 152 Cal.App.4th 919, 927 [failure to object to instructional error forfeits the issue on appeal unless the error affects the defendant's substantial rights]; see *People v. Ramos*, *supra*, 163 Cal.App.4th at p. 1087.)

## DISPOSITION

The judgment is affirmed.

HARRELL, J.

WE CONCUR:

HILL, P. J.

FRANSON, J.